1

2

3   Mark Mausert
    NV Bar No. 2398
    Sean McDowell, Esq.
    NV Bar No. 15962
    729 Evans Avenue
    Reno, Nevada 89512
    (775) 786-5477
    Fax (775) 786-9658
    mark@markmausertlaw.com
    sean@markmausertlaw.com

4

5

6

7

*Attorneys for Plaintiffs*

8

9

## IN THE UNITED STATES DISTRICT COURT

## IN AND FOR THE DISTRICT OF NEVADA

10

11   WILLIAM O'DONOHUE, JANE              Case No.:
     FISHER & LORRAINE BENUTO,

12              Plaintiffs,

13        vs.                             **COMPLAINT AND JURY DEMAND**

14   STATE OF NEVADA, ex rel. BOARD OF
     REGENTS for the NEVADA SYSTEM OF
15   HIGHER EDUCATION ("NSHE") on behalf
     of UNIVERSITY OF NEVADA RENO ("UNR"),
16   a Nevada state entity,

17              Defendants.
     _____/

18

19        COME NOW plaintiffs, through counsel, who hereby complain of defendant State of

20   Nevada (hereinafter "State" or "UNR"), as follows:

21                 Parties, Venue, Jurisdiction and Jury Demand

22        1.  Plaintiffs are residents of northern Nevada, i.e., plaintiffs reside in Washoe County,

23   State of Nevada.   All, or almost all, acts, statements, communications and omissions alleged

24   herein occurred in Washoe County, where at defendant State maintains and operates the

25   University of Nevada at Reno - hereinafter known as "UNR".   At almost all times herein

26   mentioned plaintiffs were employed by defendant/State/UNR.  Plaintiffs remain employed at

27   UNR as of the date of the filing of this Complaint and Jury Demand.  Plaintiffs hereby request

28

Page 1

a jury trial relative to all issues so triable, but reserve the right to request the Court adjudicate causes of action, without the involvement of a jury, which do not require resolution of questions of material fact.  Plaintiff O'Donohue is a man who has consistently opposed what he reasonably perceived, based on objective facts and circumstances, to be various forms of discrimination (including retaliation and retaliatory hostility), actionable per Title VII and/or Title IX, directed at co-employees, including his wife, and graduate psychology students. Plaintiff O'Donohue has obtained a  Notice of Right to Sue from the Equal Employment Opportunity Commission (EEOC).  All plaintiffs have exhausted their administrative remedies in good faith.  Plaintiffs Fisher and Benuto are entitled to Notices of Right to Sue, to be issued by the EEOC, and have requested, but not yet received such.   They therefore possess standing as parties to this Complaint and Jury Demand.   Plaintiff Fisher is a woman and has been continuously married to plaintiff O'Donohue for over the last thirty years.  Plaintiff Benuto is a woman who is a registered member of the Maidu First Nations Tribe, and who is also of Hispanic (Mexican) lineage.  All plaintiffs have routinely received favorable ratings/annual evaluations, based on their work performance, from defendant UNR, on a regular basis throughout their employment, e.g., ratings of "commendable" and/or "excellent."  This Complaint and Jury Demand is timely filed in accordance with the Notice of Right to Sue which is attached and  incorporated herein.

2.  Defendant State is one of the fifty States of the United States of America.  Defendant State employed, and continues to employ, plaintiffs at UNR in northern Nevada.  At all relevant times defendant employed at least fifteen employees for at least twenty weeks per year. Defendant State lacks sovereign immunity relative to the causes of action alleged herein as those causes of action sound in 42 U.S.C. sec. 2000e, et seq., which in turn, derives its authority from, the Fourteenth Amendment to the United States Constitution - the enactment

thereof which postdates, and therefore supersedes any immunity derivative of the Eleventh
Amendment to the United States Constitution.

    3.  This Court has venue because all, or almost all, acts, communications, statements
and omissions alleged herein occurred in northern Nevada; and defendant State does substantial
business in northern Nevada, e.g., it maintains a major University, which employs plaintiffs
and thousands of other persons.  Therefore, this Court has venue pursuant to 42 U.S.C. 2000e-
5(f)(3).

    4.  This Court has jurisdiction over this matter as plaintiffs' claims arise under Title VII
of the Civil Rights Act of 1964, i.e., 42 U.S.C. 2000e, et seq.   Subject matter jurisdiction is
invoked pursuant to 28 U.S.C. 1343.  Jurisdiction exists relative to defendant State  because
plaintiffs are a man (William O'Donohue) and two women who were subject to racial and/or
sexual harassment, and/or retaliation because they opposed what they perceived in good faith as
sexual and/or race-based harassment/discrimination, directed at themselves, or other employees
and/or students of UNR, as defined and prohibited by 42 U.S.C. 2000e, et seq., and/or Title IX.
For instance, plaintiff O'Donohue opposed sex-based, and/or race-based, harassment and/or
discrimination which he, reasonably and in good faith, perceived was directed at plaintiff
Fisher and/or various graduate students in the Clinical Psychology Program.  Further, plaintiffs
Benuto and Fisher were harassed and/or discriminated against directly "because of sex," as
prohibited by Title VII.  Plaintiff Benuto was, additionally, harassed and/or discriminated
against because of race, and also subjected to retaliatory hostility and/or retaliation because she
opposed sexual and/or race-based harassment and/or discrimination - which she reasonably and
in good faith perceived to have been directed at herself, co-plaintiffs and/or graduate students
of UNR's Clinical Psychology Program.   Plaintiff O'Donohue was subject to actionable
hostile because of his marital relationship with plaintiff Fisher.  Defendant directed actionable

gender harassment and acts of retaliation at plaintiff Fisher, in material part, for the purpose of inflicting emotional harm upon plaintiff O'Donohue. Plaintiffs have all worked, at all relevant times herein mentioned in UNR's Clinical Psychology Program.

<u>General Statement of Facts</u>

5. Plaintiffs hold doctoral degrees in psychology and have been continuously employed by defendant State/UNR (these terms will be used interchangeably), for lengthy periods. Plaintiffs, Drs. O'Donohue & Fisher, have been continuously employed by UNR since approximately1996 and have been tenured for over two decades. Plaintiff, Dr. Benuto, has been continuously employed by UNR for approximately the last 16 years. Dr. Benuto was employed in the capacity of Professor since 2016, and obtained tenure in 2021. Plaintiffs perform various functions, e.g., they teach, perform research, provide clinical services to the community in English and Spanish, and discharge various other functions such as mentoring graduate students of the Program, e.g., Drs. O'Donohue & Benuto  oversee and manage a program which provides free counseling/therapy to Nevada residents who have suffered trauma and/or psychological harm attendant to sexual abuse, and/or other crimes (hereinafter "Sexual Trauma Program").

6. At all times herein mentioned UNR held itself out to the world, current students and employees, applicants to the Program, and the APA, via multiple publications and public statements made by highly placed UNR officials, possessed of apparent and actual authority to make such statements, as an equal opportunity employer and/or educational institution which is a recipient of federal funds, which diligently attempts to prevent all forms of discrimination prohibited by federal and or Nevada laws, and which promptly, fairly and thoroughly investigates all credible complaints of discrimination (including complaints of sexual and or racial harassment), while forestalling from engaging in retaliation and/or retaliatory hostility

against complainants - whether those complainants are employees or students.   UNR represents that it routinely, fairly, effectively and promptly remedies all prohibited forms of discrimination and/or retaliation upon acquiring notice thereof, and promises employees, students and applicants for employment and student attendance that it will continue to do so. UNR promised plaintiffs, implicitly and explicitly it would fairly and effectively enforce other policies, e.g., those policies and policies memorialized in its Administrative Manual and other documents, e.g., "50: Temporary Administrative Governance" [TAG] (Revised: April 2009) - policies governing initiation and the administration per TAG.   UNR made such promises/representations to plaintiffs to these effects at the commencement of each plaintiff's employment, and periodically throughout the employment of each plaintiff - up until the present.  Plaintiffs repeatedly relied, and were legally entitled to so rely, on the promises of UNR, as memorialized in whole or part in UNR's published policies regarding sexual and/or racial discrimination - including promises/assurances regarding the content of such policies, investigation and/or enforcement thereof, protections of complainants (e.g., protection from retaliation and/or retaliatory hostility), good faith compliance with federal and/or Nevada laws/public policies regarding sexual/racial harassment and/or discrimination, etc.  UNR intended thereby to induce plaintiffs' reliance and plaintiffs were legally entitled to so rely, and did so rely on such promises and/or assurances, both written and/or verbal and/or direct or implied.  UNR should be therefore be equitably estopped from denying and/or avoiding its obligations to abide by and follow its discrimination policies, in good faith, with due diligence, in letter and spirit - as well as UNR's obligation to forestall from any material deviation and/or breach of its discrimination policies, express or implied.

7. UNR has, on multiple occasions, knowingly failed to timely, effectively, fairly and/or properly enforce its anti-discrimination/harassment policies - relative to plaintiffs, the

students plaintiffs teach and/or mentor, and other employees and students. For instance, during at least the last ten years, prior to June 1, 2024, UNR often failed to timely respond to Title IX complaints; failed to properly and thoroughly train employees and students regarding anti-discrimination/harassment policies; failed to create and/or maintain clear and effective reporting channels for discrimination/harassment complaints; allowed racist hate speech, e.g., posting the word "nig__r" and the yelling of that word in students' on-campus residences - based on the fictive premise such was protected speech; failed to respond to known conduct, complaints and/or speech which indicated faculty and persons such as Chair Crognale harbored and indulged gender and/or racist animus; failed to allow for cultural and language differences re foreign students, and/or students who speak English as a second language and are not therefore as skilled as American-born, native English-speaking students in understanding and acting up nuances and linguistic ambiguities and subtleties; and engaged in other failures, lapses and acts of misconduct as alleged herein. At almost all times herein mentioned plaintiffs have each been aware of many such knowing failures and lapses by UNR, both relative to themselves and other UNR employees and students - including students whom plaintiffs have mentored and are mentoring. Plaintiffs have been reasonably, and in good faith, motivated to oppose conduct, statements and/or policies which they viewed as discriminatory and/or having the potential to facilitate various forms of discrimination, relative to themselves, other employees, and students who were studying and/or working in the Clinical Psychology Program and/or Department.

8. In addition to other instances of opposition to gender and/or racial discrimination alleged herein, plaintiffs have opposed a number of actions and/or statements which they reasonably perceived as constituting discrimination/hostility sounding in sexual and/or racial harassment. For instance, plaintiffs Benuto & O'Donohue opposed race-based allegations of

plagiarism directed at themselves and/or students they supervised or mentored (made by Prof. Weierich in October, 2022); Plaintiffs Fisher and O'Donohue opposed Chair Crognale's negative statements re plaintiff Benuto's suitability for tenure, based on relevant criteria, and Crognale's refusal to forward her tenure application in 2019 and 2020; plaintiffs objected to various audits and investigations defendant caused to be directed as them, commencing in 2019 and some continuing to present;  in October, 2023, plaintiff O'Donohue filed a complaint against Provost Thompson and other administrators in the employ of defendant for the placement of the Program in TAG, and the maintenance of TAG status since 2020; on July 21, 2023, plaintiff O'Donohue filed a "Bystander Title IX Complaint" with defendant, and thereby opposed what he reasonably perceived to be racial discrimination against Program graduate students (see attached Complaint, incorporated herein); in January, 2024, plaintiffs filed complaints with defendant's accreditation agency, the American Psychological Association (APA), based on various discriminatory actions, including placement in TAG, and maintenance of TAG status; plaintiffs opposed UNR's failure to adhere to accreditation requirements intended to protect minority students, e.g., having a plan to facilitate retention of minority faculty and students; plaintiffs opposed investigations directed ast themselves, e.g., in February, 2024, plaintiff Benuto defended herself against spurious charges of research misconduct, etc.; in March of 2024, plaintiffs provided testimony in an internal UNR proceeding against Provost Thompson - based in material part on their reasonable perceptions Provost Thompson engaged in Title VII race-based and/or gender-based forms of discrimination (Chair Crognale verbally attacked plaintiff Benuto during her testimony as Provost Thompson sat idle and the Faculty Chair of the proceeding was compelled to intervene in order to stifle Chair Crognale's attack (actionable per Title VII because of its retaliatory character)); plaintiffs filed NERC and/or EEOC Charges and have been subsequently subjected

to acts of retaliation and retaliatory hostility; etc.  In December, 2024, UNR conducted an investigation in an abusive manner, which constitutes a form of retaliatory hostility, directed at plaintiff Benuto.  That is, defendant inquired into plaintiff's medical/sexual history while refusing to make the showing of relevance, required per Federal Rule of Evidence 412, and then used plaintiff's refusal to accede to the abusive inquiry as a basis to justify charging plaintiff with dishonesty.

9.  Plaintiff Dr. Fisher has experienced sexual hostility, exhibited by a number of male UNR employees during many years.  For instance, approximately seven years ago, plaintiff Fisher had a conversation with Chair of the Clinical Psychology Program, Dr. Michael Crognale.  For example, in response to plaintiff Fisher's suggestion one of two women, each skillful and respected faculty members, would be good candidates for the position of Director of Clinical Training (DCT), Chair Crognale responded both women were "tenure mistakes".  Chair Crognale made this statement within easy earshot of students and/or other persons in the hallway wherein plaintiff Fisher and Chair Crognale were located while discussing this matter.  Plaintiff Fisher, based on a number of facts and circumstances known to her, e.g., the qualifications and performance of two female Professors, Chair Crognale's derisive/inappropriate demeanor, Chair Crognale's past misogynistic/sexist remarks and/or conduct, etc., reasonably apprehended Chair Crognale was indulging in prejudice based on gender, and that Chair Crognale would continue to manifest gender-based prejudice via his decisions as Chair of UNR's Psychology Department.  Plaintiff Fisher has endured gender-based harassment for years, e.g., former Chair Steven Hayes openly mocked Dr. Fisher's intelligence and/or professional abilities - to the extent plaintiff Fisher forestalled from seeking and/or accepting a second term as Director of Clinical Training in the Program.

10.  Chair Michael Crognale has been Chair of defendant UNR's Psychology

Department for approximately the last nine years.   Dr. Crognale remains in the position of Chair of the Psychology Department and is therefore possessed of authority to make various important decisions, and exercise various forms and/or manifestations of authority which directly influence and impact the quality of plaintiffs' work environment on a daily basis, and plaintiffs' ability to perform their duties.  Chair Crognale has made statements, in plaintiffs' presence and in the presence of other employees of UNR's Psychology Department, so as to make his prowess as a martial artist common knowledge among those who work and/or study in the Psychology Department.  Michael Crognale is a muscular man, who is possessed of apparent physical strength superior to that of a stereotypical woman, and to that of plaintiffs Benuto and Fisher.  Dr. Benuto is not possessed of unusual strength or fighting ability.  For more than the last ten years Dr. Benuto has been aware of Dr. Crognale's self-advertised expertise and capabilities as a marital artist   Dr. Benuto been aware, and are aware, that at any time, if Chair Crognale's manifestations of anger escalate beyond the open and severe displays he has periodically engaged in, Chair Crognale could do severe and perhaps irreparable physical harm.  Dr. Benuto has been, and is, aware of her potential vulnerability, i.e., she is cognizant, and at all times herein mentioned has been so aware, she would very likely be quickly overcome and physically incapacitated/injured if Chair Crognale's open manifestations of anger escalated to physical violence.  Plaintiffs, and have been at all times herein mentioned, prohibited from carrying dangerous weapons, e.g., firearms, by the policies of UNR, on the premises of UNR, and thereby possessing a reasonable level of confidence in their ability to defend themselves from a skilled martial artist such as Chair Crognale.  Each plaintiff has been aware, or at least the last eight years, that Chair Crognale harbors, and has continuously harbored, intense dislike, or even hatred, toward each of them.   Plaintiff Benuto has harbored an objectively reasonable fear and/or apprehension Dr. Crognale might resort to perpetrating

violence against her- based on Dr. Crognale's hostile demeanor, tone of voice, the substance of his statements, his Response to the 2023 External Review Report, etc.  UNR has known and/or should have known of Chair Crognale's hostile demeanor, open displays of anger toward plaintiffs.  See, e.g., Chair Crognale's statements which are memorialized in his Response to the 2023 External Review Report.

11.  Upon information and belief, various highly placed officials, or at least one official, superior to Chair Crognale (e.g., former Dean Thompson), read and/or edited, or proffered suggested changes and/or otherwise approved the content of Crognale's Response to the 2023 External Review Report, explicitly and/or tacitly.  Each of Chair Crognale's statements and/or omissions, memorialized in his Response to the 2023 External Review Report is subject to binding attribution to defendant UNR, e.g., as admissions against interest.  UNR ratified by action, and by subsequent inaction, the substantive content of Chair Crognale's Response to the 2023 External Review Report.  The statements, assertions and/or omissions of Chair Crognale's Response should be considered those of UNR and UNR should be equitably estopped, based for instance on the fact UNR has known of the content of the Response for over a year, but has failed to edit and/or otherwise correct that content.  UNR is further equitably estopped because, notwithstanding the content of the 2023 External Review Report, UNR has failed to adequately investigate based on the content of the External Review Report and/or attempt to foment and/or implement remedial and/or preventive actions or measures - the necessity of which is self-evident, or reasonably required, based on the substantive content of the 2023 External Review Report - and as manifestly required by UNR's polices, Nevada law and 42 U.S.C., et seq.

12.  Shortly after plaintiff Dr. Benuto became a UNR Professor in 2016, Chair Crognale commenced a course of discriminatory, disparate treatment toward her and has continued with

that course of potentially actionable conduct, per Title VII, to this date.  Incidents of
unfavorable disparate treatment and hostility, motivated by gender and/or national origin
animus/racial as well as retaliatory hostility, perpetrated and/or manifested by Chair Crognale,
have been frequent and integrally related to each other since 2016.   That is they form and
constitute a single continuing course of actionable conduct per Title VII.  This continuous
course of conduct has been intensified and rendered even more hostile via overtly
discriminatory and/or disparate treatment directed at other employees and students, similarly
situated, i.e., women and/or non-White persons, who have emigrated to the United States
and/or persons who have opposed gender and/or national origin/racial
harassment/discrimination.  Dr. Benuto learned of almost all such conduct, shortly after such
occurred and this knowledge intensified and increased the level of actionable hostility she
experienced in her work environment.  Dr. Benuto, at almost all relevant times, was cognizant
highly placed officials/employees of UNR were cognizant, or should have known, of most or
all of Chair Crognale's sex and/or race-based manifestations of hostility, but failed to
investigate and/or remediate and prevent further manifestations thereof.   Drs. O'Donohue &
Fisher were likewise promptly aware of almost all such statements and/or actions, of UNR's
knowledge thereof and/or UNR's failure to remediate and/or implement preventive measures,
or even investigate adequately.

     13.  The sex-based and/or race-based course of actionable hostility (including retaliatory
hostility) Dr. Benuto experienced was punctuated by incidents of retaliation, which increased
the intensity of the hostility she endured, as did UNR's failure to adequately investigate acts of
retaliation and/or adequately remedy such and/or prevent further acts of retaliation.  Dr. Benuto
was aware, re all or almost all alleged acts of retaliation, of the acts themselves and/or of
UNR's contemporaneous knowledge thereof, in conjunction with UNR's studied failures to act.

Some of the hostility plaintiff Benuto has been subjected to include the following: (1) statements by then Dean Jeff Thompson which denigrated psychological services provided by plaintiff Benuto to members of the Latino community, e.g., ("[i]t sounds like a circus"; (2) hostile and intimidating statements by Chair Crognale in response to Title VII protected opposition, e.g., "[y]ou need to just shut up an keep your head down"; (3) derisive statements by other highly placed UNR employees, e.g., by William Follette, "[i]f Lorraine [Benuto] is going to keep accepting minority students, we are going to have to accept that we will need to change [i.e., lower] our standards"; (4) accusations made by Chair Crognale to plaintiff Benuto that she is responsible for "White flight," , i.e., "[y]ou are responsible for five esteemed faculty leaving (also see, Crognale's Response to the External Review Report); and (5) Crognale's physical intimidation of plaintiff Benuto, e.g., standing over her and close while yelling at plaintiff; etc.

14. Drs. Fisher and O'Donohue (Dr. O'Donohue experienced retaliatory hostility, and acts of retaliation, provoked by gender animus toward plaintiff Fisher and in material part by plaintiffs' opposition to harassment/discrimination directed at Drs. Fisher & Benuto, and various graduate students). The intensity of the actionable work environments the three plaintiffs endured has been further intensified by hostility manifested by other highly placed UNR officials (as well as by at least one Department Professor) including, in addition to Chair Crognale, Director of Clinical Training, Dr. Paul Kwon, Provost Jeff Thompson, and former Dean Katherine McCall.   Faculty member Mariann Weierich frequently manifested hostility towards plaintiffs Benuto & O'Donohue, actionable per Title VII, the genesis of which is gender and/or national origin animus, and/or retaliatory animus.  She also manifested hostility, in various forms, towards minority students whom plaintiffs mentored and or assisted and otherwise had close professional relationships with.  For instance in 2022 and/or 2023 Prof.

Weierich told Program minority students that their research, directed at assisting persons of color who had been traumatized and/or had other psychological difficulties was unimportant and unneeded.   The graduate students reasonably perceived Prof. Weierich's statements (as well as those of others, e.g., Chair Crognale) as a crystalline manifestation of racism and promptly communicated the statements and their perceptions to plaintiffs, who were offended based on race and who thereby experienced additional and intensified hostility, actionable per Title VII.  Dr. O'Donohue has experienced myriad forms of hostility, e.g., per defendant's actions he no longer participates in faculty searches, is denied input into Program decisions per TAG, is compelled to endure hostility as the result of retaliatory hostility, gender and/or race-based animus directed at his wife, Dr. Fisher and the students he mentors, etc.

15.  The intensity and actionable nature of the work environments plaintiffs have experienced have been further intensified by defendant UNR's knowing facilitation and/or toleration of the various forms of Title VII hostility directed at plaintiffs, and in addition by various discrete acts of retaliation, e.g., recently manifested by repeated unwarranted investigations directed at plaintiffs Benuto & O'Donohue.  Such investigations have the predictable effect of resulting in severe emotional distress and they may easily, and even probably, result in termination of employment.  Such hostility and/or discrete acts of retaliation are like and/or reasonably related to the actionable hostility and/or retaliation alleged in plaintiffs' Charges of Discrimination and therefore additional Charges of Discrimination are not required in order for such to be litigated via this Complaint and Jury Demand.  Such subsequent hostility and/or acts of retaliation are integrally related to  the hostility and/or acts alleged in the extant Charges of Discrimination all three plaintiffs previously filed.

16. The Program graduate students have regularly informed plaintiffs of other instances of race-based hostility by Prof. Weierich, Provost Thompson and Chair Crognale and plaintiffs

have thereby experienced additional and intensified race-based hostility.  Upon information and belief, one or more of these individuals were involved, in a material manner, in the decision to award a Program Fellowship, intended to benefit minorities, on at least one-occasion, to a non-minority student.  See, e.g., September 15, 2023, Declaration of Francisco Reinosa Segovia re the award, in 2021, of the Mikawa Fellowship, incorporated herein. That is, UNR received and accepted an endowment from the Mikawa family and agreed thereby to abide by the terms of that endowment, which provided in material, a Fellowship be provided to ethnic minority students.  The endowment also provided funding to employ a nationally recognized scholar in clinical psychology who has a history of demonstrating concern and commitment to the professional advancement of ethnic minority students.  UNR violated its commitment and broke its word to the Mikawa family. For instance, it employed Prof. Weierich with Mikawa endowment funds.  Prof. Weierich does not have a history of commitment to minority students. To the contrary, she has the subject of a number of racial discrimination complaints.  Additionally, on at least one occasion, UNR allocated Mikawa endowment funds to White American student, even though a qualified minority student had applied for the Mikawa Fellowship.

17.  Plaintiffs became aware of a number of race-based complaints by Program graduate students they mentored and had close, collegial relations with.  For instance, on May 3, 2023, graduate student Ms. Cossette Canovas, of Hispanic origin, complained to Paul Kwon in his official capacity of race-based discrimination and racism (e.g., limiting the income of minority students by confining their paid work hours to 20 per week) via an email.  Chair Crognale immediately responded to Ms. Canovas via email. Rather than attempt to redress her complaint, Chair Crognale resorted to derision and insult.  His substantive response reads in its entirety:

As chair of the department, I am rather surprised at the tone of your letter to Dr. Kwon. You state in bold " [sic]. **I demand that the program runs a data analysis to determine the validity of Dean McCall's decision ...".** I am wondering where you might have gotten the notion that you have the authority "demand" that the DCT challenge the Dean's decision in this academic matter. Is this how you are being trained to interact with others?

May 3, 2023 email by Chair Crognale (emphasis in original).

Ms. Canovas responded as follows, via email on May 4, 2023:

I am being trained as a junior colleague, and evidence-based clinician, and a data-scientist. This means I have a commitment to advocating for the use of data in determining policy and to advocating for disadvantaged persons of color who are disproportionately targeted by discriminatory practices. Furthermore, I am surprised that instead of reaching out to me to focus on the real issues I brought forth in my email to Paul, you have instead reached out to police the one of a Latina woman of color. As you may or may not be aware of as the chair of the department, there have been multiple attempts to bring forward concerns to program faculty that have been met with dismissal or been directly ignored, which once again, deserve more attention than the tone of my email.

This portion of an email chain is representative of defendant's consistent and protracted refusal to investigate and/or otherwise redress complaints of race-based and/or sex-based forms of discrimination, and in the stead thereof, to direct retaliatory hostility at complainants, including plaintiffs.

18. The course of race and/or sex-based hostility/retaliatory hostility Dr. Benuto endured since 2016 includes, but is not limited to, the following: Assignment by Chair Crognale of inferior lab space, i.e. small size; condition of that space when assigned - littered and dirty; inferior pay, not commensurate with her experience and skill, starting in 2016; refusal of her request to hire spouse (who is also a licensed and skilled psychologist); disparaging and unwarranted remarks in Dr. Benuto's presence, and outside of her presence, directed at her colleagues, about Dr. Benuto and/or the quality of her work, e.g., stating Dr. Benuto did not do "real" research; telling Dr. Benuto to "keep your mouth shut and your head down; withholding acknowledgment of grants and accomplishments (routinely directed at Dr. Benuto's colleagues); failing to meet with Dr. Benuto for the purpose of inquiring what Chair Crognale could do to provide support in his capacity as Chair, while nonetheless routinely meeting with her colleagues on an annual basis for that purpose; denying Dr. Benuto various

forms of support and/or encouragement, routinely extended to others similarly situated; gaslighting Dr. Benuto in response to her attempts to confront and terminate such, i.e., Crognale's concealment/refusal to acknowledge steadfast gender, racial and/or retaliatory animus *was itself a form of continuous and actionable Title VII hostility*; indulging in sarcasm directed at plaintiff regarding his "gaslighting" of plaintiff, see, e.g., February 20, 2024, email from Chair Crognale to Dr. Benuto); foregoing from introducing Dr. Benuto to new Department faculty members, while nonetheless introducing Dr. Benuto's Department colleagues; failure to properly evaluate Dr. Benuto's annual performance, e.g., one year she published peer-reviewed papers and only received a "commendable" evaluation; manifesting an overtly belligerent demeanor toward Dr. Benuto while knowing she was pregnant, in the presence of her colleagues, and in the context of having repeatedly discussed martial arts prowess with Department/Program personnel (Dr. Benuto was well aware that Chair Crognale held himself out as capable of quickly inflicting severe physical harm per martial arts expertise); etc.

19. Each plaintiff opposed what was reasonably perceived by each as discriminatory conducted by defendant, and  directed at other employees and/or students, as well as themselves.  For instance, commencing as early as February 28, 2019, plaintiff Benuto communicated via email to Dean Moddelmog (College of Liberal Arts), and thereby opposed alleged discriminatory/disparate directed at herself by Chair Crognale, based on race and sex. Plaintiff Benuto followed and continued to opposed discriminatory race-based and sex-based conduct by Chair Crognale by meeting with Dean Moddelmog and supplement the email/complaint of February 28, 2019.  Plaintiff Benuto explained to Dean Moddlemog that Chair Crognale was treating here, e.g., making employment decisions and denying information in a negative manner, not extended to male employees and/or White employees, similarly situated.  On March 8, 2019, plaintiff Fisher reported Crognale's bullying behavior and disparaging remarks to Dean Moddlemog.   Defendant failed to take any meaningful investigative or remedial action in response to plaintiff Fisher's complaint.

20. Plaintiff Benuto opposed what she reasonably perceived as discriminatory conduct

Page 16

directed at minority graduate students in the Clinical Psychology Program whom she advised and/or mentored, formally or informally.  For instance, in the Fall of 2022, plaintiff Benuto met with Director of Clinical Training, Paul Kwon, and opposed what she perceived as unwarranted discipline directed at such minority students, the genesis of which plaintiff Benuto perceived reasonably as language difficulties arising from different national origin, i.e., English was a second or third language for the students.  Plaintiffs collectively and frequently opposed what they reasonably perceived as race-based discrimination directed at minority students in the Clinical Psychology Program.

21.  In the Spring of 2023, subsequent to a student survey, produced by graduate psychology students, which alleged racial discrimination directed at them, plaintiff Benuto, acting in concert with plaintiffs Fisher and O'Donohue, attempted to initiate conversations with colleagues in the Program for the purpose of redressing discrimination which the students complained of and/or preventing further race-based discrimination.  In the Fall of 2023, plaintiffs Benuto and O'Donohue sent emails to Dean or Associate Dean McCall and Director of Clinical Paul Kwon, which further opposed what they reasonably perceived as race-based discrimination directed at graduate students in the Clinical Psychology Program.

22.  Each plaintiff engaged in other forms of opposition to what they reasonably perceived as race-based discrimination directed at Program graduate students.  For instance, they had numerous conversations with colleagues and management personnel, such as Dean McCall, Director Kwon.  Plaintiff Benuto also filed a formal complaint on behalf of herself with defendant's Title IX Office on or about May 18, 2021, based on race.  Plaintiff O'Donohue filed a bystander Title IX complaint with defendant's Title IX Office on or about August 15, 2023, based on race and gender - on behalf of graduate Program students and plaintiff Benuto.  Plaintiff Benuto filed a similar complaint with defendant's Title IX Office on or about September 8, 2023, on behalf of Program graduate students.  Plaintiffs Fisher & O'Donohue complained on behalf of how unfair and discriminatory plaintiff Benuto's tenure process had been, based on racial animus, in the Fall of 2020.  This complaint was sent to Chair Crognale by plaintiffs Fisher & O'Donohue.  Plaintiff Plaintiffs' various forms of opposition

constituted protected activity per Title VII.

23.  As a direct and proximate result of having engaged in such opposition, as well as opposition interposed in response to discrimination reasonably perceived to have been directed at themselves, defendant was motivated to retaliated against plaintiffs, and each of them, and did retaliate in a myriad of ways in response thereto, as alleged herein.  Defendants' discriminatory conduct, alleged throughout this Complaint and Jury Demand, was motivated in material part by plaintiffs' opposition, and/or by the marital relationship of plaintiffs Fisher & O'Donohue, and/or by the gender of plaintiffs Benuto & Fisher, and/or by the genetic racial makeup of plaintiff Benuto.

24.  The discriminatory conduct alleged to have been directed at Program graduate students, in conjunction with the delays by defendant in responding to complaints thereof, inadequate investigations thereof, and/or the failure to investigate, and the lack of adequate remedial and/or preventive action by defendant materially contributed to and enhanced the intensity of actionable Title VII related hostility plaintiffs suffered.  Plaintiffs each endured intense emotional distress because of their inability to protect graduate students whom they deeply care about.

25.  Chair Crognale contributed to the hostility each plaintiff endured by, occasionally, surfacing his true feelings of animosity toward plaintiffs via displays of open anger.  However, he engaged in a protracted course of deceit by omission and thereby pretended to be an impartial Chair.  Crognale, notwithstanding harboring, tenacious, long-term and continuous intense gender, racial/national origin and/or retaliatory animus towards each of the three plaintiffs, failed to recuse himself, as required by defendant's policies upon which plaintiffs justifiably relied, from decisions directly involving plaintiffs.  This dynamic was well known to plaintiffs throughout almost the entirety of Crognale's tenure as Chair and served to markedly increase the level and intensity of the hostility they endured, i.e., plaintiffs were aware of the intensity and tenacity of Crognale's animus, and of his concealment and denial thereof.

26.  The "mere presence" of Crognale in plaintiffs' work environments, in his capacity as Chair of the Psychology Department, came to constitute an actionable, hostile Title VII work

environment, during at least the last five years for each plaintiff - in material part as the result of fear and/or apprehension Crognale might engage in violence toward them, and/or each other. *See, e.g., Ellison v. Brady,* 924 F.2d 872 (9th Cir. 1991); *Draper v. Coeur Rochester*, 147 F.3d 1104 (9th Cir. 1998). Plaintiffs Fisher and O'Donohue have been, at all times herein mentioned, married. Each endured fear and/or apprehension the other would be harmed by Crognale while at work. Each endured emotional distress as the result of knowing the other had been subjected to harassment/retaliatory hostility and/or acts of retaliation by Crognale, and other UNR personnel, and was almost certain to be subjected to further harassment and/or acts of retaliation, actionable per Title VII. See, *Ellison v. Brady,* 924 F.2d 872 (9th Cir. 1991); *Draper v. Coeur Rochester*, 147 F.3d 1104 (9th Cir. 1998). This fear, apprehension and emotional distress is actionable per Title VII as, standing alone, it was of sufficient intensity, duration and frequency - such has been constantly present for both plaintiffs Fisher & O'Donohue for the last five years - such as created and maintained an actionable work environment per Title VII based on gender harassment and/or retaliatory hostility.

27. Chair Crognale has indulged, during approximately at least the last five years, in open displays of intense anger toward Dr. Benuto, in the presence of her colleagues, on the work premises of the plaintiffs, as well as other female faculty members. Chair Crognale, while manifesting visible and intense anger via demeanor, tone of voice and body language, has openly, in the presence of numerous faculty members supervised by him, made hostile and unprofessional statements such as, "I'm seething with anger," and "[y]ou're pissing me off." Chair Crognale has manifested intense anger via the tone and decibel level of his voice, the content of his speech, body language, facial expressions and general demeanor. Many UNR employees, including management-level employees, have witnessed and/or become aware of Chair Crognale's intimidating and open displays of intense anger, while also being aware of Chair Crognale's size, strength, skill and training in martial arts - and his open references in the workplace relative to martial arts training and skill.

28. As a direct and proximate result of fear created by Dr. Crognale's oral statements, and written statements (especially his written response to the 2023 External Report - see infra),

open displays of intense anger, some of which have been directed at plaintiffs Fisher and Benuto; knowledge of Chair Crognale's martial arts abilities; and UNR's failure to prevent and/or remedy Chair Crognale's intimidating displays of anger (which plaintiff either witnessed or became aware of), Dr. Fisher reduced and self-censored, at various times, her participation in faculty meetings - so as to minimize in-person contact with Chair Crognale.   Dr. Fisher for a period, ceased participation re in-person faculty meetings and otherwise limited and/or ceased participation in the UNR's Psychology Department in order to minimize in-person contact with Chair Crognale as a direct and proximate result of fear, apprehension and/or emotional distress which plaintiff has experienced because of his presence.  All plaintiffs, and especially Dr. Benuto has been in fear of the specter of violence by Chair Crognale for at least the last five years.  A reasonable person, man or woman, similarly situated to plaintiffs, would likely and reasonably have suffered, and be currently suffering from such fear and apprehension - especially while cognizant, of UNR's knowing failure to prevent and/or remedy Chair Crognale's open displays of intense anger, and other forms of harassment.

30.  The plaintiffs have, for at least the last seven years, routinely and frequently communicated among themselves regarding various forms of discrimination/harassment herein alleged.  Plaintiffs have also communicated with a number of students of the Clinical Psychology Program, who informed one or more of the plaintiffs (who then informed the other plaintiff or plaintiffs not privy to the initial conversation) of reports and/or perceptions of acts and statements which were perceived as manifestations of sexual and/or race/national origin-based harassment.  The level of actionable hostility which each plaintiff has experienced was increased by the resultant knowledge, as well as by the awareness of UNR's toleration of statements and actions evidencing and/or manifesting discriminatory/retaliatory animus, in addition to being aware of acts of retaliation and/or discrimination manifested by highly placed UNR personnel, e.g., UNR's former General Counsel's refusal to conduct thorough investigations of plaintiffs' complaints of gender and/or race-related harassment/discrimination and/or retaliation - unless those interviews could be used by UNR in prospective litigation against the plaintiffs, and each of them.  Each plaintiff became aware, shortly after its

occurrence (or another plaintiff acquiring knowledge thereof), of each material act and/or statement which manifested discriminatory animus and which was directed at, witnessed by, or learned of by the other plaintiffs.

31. UNR has consistently failed to timely, thoroughly and fairly investigate concerns and/or complaints, expressed and/or lodged, of various forms of discrimination allegedly directed at plaintiffs and a number of psychology students - especially female students and racial minority students.  At all times herein mentioned plaintiffs have been aware of these routine failures.  UNR has so failed, despite receive notice which should have triggered investigations, e.g., numerous complaints by students and employees, including plaintiffs, and in particular the 2023 External Review Report, supplemented by Chair Crognale's Response.  This significance of the notice provided by the 2023 was, in an obvious and startling manner, amplified and intensified by the fact Chair Crognale roundly castigated and vilified Drs. Benuto, Fisher & O'Donohue via his Response to the 2023 External Review Report, *but participated and authorized, in his capacity as Chair of the Psychology Department, favorable reviews of the plaintiffs, year after year, for approximately the last ten years (last year being an exception re the plaintiffs (Chair Crognale did not participate in 2023))*.  UNR was thereby placed on notice of Chair Crognale's animus toward plaintiffs; Crognale's consciousness of guilt re that animus; that Crognale has been attempting to conceal that animus via deceit by omission during approximately the last ten years; the primary genesis of the intense toxicity Crognale alleged in his Response, i.e., Crognale is the person responsible for that toxicity; corroboration of many of the findings of the 2023 External Review Report; and of the immediate need for a thorough investigation, followed by strong remedial and preventive action.

32.  As a direct and proximate result of the toxicity/hostility described by three independent auditors who authored the 2023 External Review Report, and the deleterious effects caused by the creation of a sexually-based and racially-based hostile work environment in the Clinical Psychology Program (hereinafter "Program"), UNR placed the Program under Temporary Administrative Governance (TAG) in October, 2020.  The Program continues to be

operated per TAG status, which remains in force. Placing the Program in TAG status, and maintaining TAG status for an usually long period (antithetical to a "temporary" status), was motivated in material part by sexually and racially-based animus the decision-makers responsible for the decisions to place the Program in TAG, and maintain TAG status. That is, the UNR decision-makers harbored that animus relative plaintiffs. Regardless of whether actionable animus motivated the decision to place in TAG status, TAG status has had adverse effects upon plaintiffs, as alleged below. Those effects have been known to Chair Crognale, Provost Thompson (formerly the Dean of the College of Science, who primarily responsible for placing the Program in Tag), President Brian Sandoval, and other highly placed UNR officials. UNR, as stated, has maintained TAG status for the purpose of retaliating against plaintiffs by diminishing their ability to participate in the Program, as alleged below. Other faculty have been allowed to have significant input into decisions regarding the Program; to serve on faculty search committees and other functions; but plaintiffs have been excluded therefrom.

33. Chair Crognale materially contributed to the decision to place the Clinical Psychology Program in TAG. He consulted with then Dean of UNR's College of Science Jeff Thompson (currently Provost of UNR) regarding placement of the Program in TAG, and then Dean Thompson referenced Chair Crognale's input in his November 4, 2020 memo to Executive Vice President and Provost Kevin Carman, i.e., the memo which resulted in the Program being placed in TAG .

34. As of November 4, 2020, UNR, via Dean Thompson, manifested (via his memo of that date) actual knowledge of hostility and attendant difficulties in the Program, which then Dean Thompson stated necessitated placement of the Program in TAG. Dean Thompson manifested knowledge that conflicts and problems in the Program resulted in the departure of faculty members and graduate students and that Chair Crognale was unable to resolve those conflicts and problems. Dean Thompson's November 4, 2020 memo reads in part:

> It is clear to me that after numerous attempts by the Chair [Dr. Crognale], department faculty and the university administration, the Clinical Psychology Program is not providing its faculty or graduate students an environment conducive to meeting their expected potential.
> . . . .

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> I am convinced that there has been significant conflict among faculty of the program that is pervasive and cannot be resolved by the previous directors and current Chair and no internal change in leadership will remedy the situation. I also believe the university and our community benefits from the Clinical Psychology Program and with the recommended intervention, a strong and healthy academic and community-serving program can be developed from the current program.

Page 1 of then Dean Thompson's November 4, 2020 memo.

35. Dean Thompson, in November, 2020, did not recommend an investigation, or otherwise take reasonable measures to cause an investigation to be initiated, notwithstanding his responsibility to do so. The difficulties and problems Dean Thompson described, and the hostility - actionable per Title VII - alleged herein, continued, and necessitated the investigation by three external auditors, which resulted in the 2023 External Review Report.

36. As elsewhere alleged, instead of initiating an investigation per the actual knowledge of UNR, possessed as of November, 2020, and prior thereto, and confirmed by complaints made after November, 2020, and by the 2023 External Review Report and Chair Crognale's Response, for the purpose of ascribing responsibility for difficulties, problems and past and ambient, ongoing hostility in the Program, UNR accepted, in a de facto manner, Chair Crognale's claims plaintiffs have been, and are, exclusively culpable for said past and current problems, difficulties and hostility. UNR, instead of properly, impartially and thoroughly investigating the problems, difficulties and hostility attendant to the Program, abdicated this duty and embarked upon a course of action intended to, and which will have the practical effect, of causing, one way or another, e.g., by constructive discharge, plaintiffs' departure from the employ of defendant, and from the Clinical Psychology Program. UNR's decision to proceed in this manner became has been apparent to plaintiffs since the Program was placed in TAG. Plaintiffs' conclusion to this effect was confirmed and reinforced via the External Report, Chair Crognale's Response to that Report (filed with the knowledge, acquiescence and approval of Provost Thompson and other UNR officials), UNR's failure to take proper, effective action per the External Report, continued hostility which has been allowed to manifest by Crognale toward plaintiffs (some of it openly manifested, e.g., yelling at Dr. Benuto in the presence of a number of UNR faculty members) sans remedial action and/or adequate inquiry

by UNR, etc. This knowledge, possessed by plaintiffs, has materially contributed the hostility they have experienced, and has intensified other forms of hostility they have experienced. Plaintiffs have understood, for years, they are bereft of any protections they should be enjoy per anti-discrimination and anti-retaliation policies UNR promised would protect them. This awareness has contributed to the hostility they have endured and has magnified and intensified hostility resulting from the other acts and statements alleged herein, as well as the non-economic adverse effects of discrete acts of retaliation.

37. Per placement TAG status, UNR should have promptly and consistently taken various actions to ensure the Program returned to normal status, i.e., TAG status should have been lifted as soon as practical. Various measure have available to attempt to remediate the problems which resulted in placement in TAG status. For instance, an external consultant could have been hired to identify problems, e.g., the source of ongoing hostility; foment practical solutions; and implement those solutions. Further, UNR could have followed the recommendations of the 2023 External Review Report, but did not do so. UNR could have attempt to cause the employees of the Program to cooperate in improving communication so as to establish a collegial working environment, i.e., dissipating ambient and persistent hostility. No such measures were taken.

38. UNR has failed to followed establish procedures and requirements which attend TAG status, e.g., reporting requirements relative to employees, including plaintiffs, i.e., annual reports. UNR failed to following reporting requirements, other requirements and failed to take and/or attempt meaningful, good faith efforts to achieve the removal of TAG status in order to retaliate against plaintiffs and facilitate other forms of retaliatory hostility and/or acts of retaliation - per the increased level of control TAG vests in decision-makers who harbor sexual, racial and/or retaliatory animus towards plaintiffs. For example, Chair Crognale, per TAG status, must consult with plaintiffs and other employees about decisions (as alleged herein) which directly affect those employees and the students they supervise. UNR's published procedures re "Temporary Administrative Governance," which were provided to plaintiffs, and upon which plaintiffs relied, and were entitled to so rely, provided in material part, that TAG

"is an intervention of last resort . . . " and will be initiated only after ac clear written explanation is provided to the faculty.  UNR's TAG procedures provide, in material part:

> At the end of each year the department remains in TAG, the executive vice president & provost and the dean shall conduct an annual review of the department.  Each such review shall note specific progress made and any deficiencies found.

UNR failed to abide by this provisions, and other provisions regarding TAG, as a direct and proximate result of UNR's perversion and weaponization of the TAG provisions, implemented for the purpose of discriminating and/or retaliating against plaintiffs.

39.  Per TAG, plaintiffs' jobs, the quality of their daily work lives, and their ability to properly function, e.g., to exercise meaningful influence over the Program and their participation therein, are materially and adversely affected on a daily basis, and have been so affected since October, 2020.  TAG results in the material diminution of the ability of plaintiffs to express themselves in a meaningful way; to attend meetings (previously and routinely conducted - prior to TAG status being implemented) at which information was exchanged and during which decisions re the operation of Program were made, with the benefit of input by plaintiffs and others similarly situated; etc.  Plaintiffs are now precluded, per TAG status, from participating in decisions re how students are admitted to the Program; how students are trained; who teaches what classes; what academic achievements are required of students; which persons will be hired to work in the Program; to some material degree where students and at what tasks they are employed; what work and/or educational activities students may engage in; what type of services students may participating in providing (with oversight from plaintiffs Benuto and O'Donohue) through the Psychological Services Program; the choice of who directs the Program; etc.   Inability to participate, e.g., have meaningful input into these decisions has, and continue to have, an adverse effect on the quality of plaintiffs' work environment, their enjoyment of work, their reputations, and their ability to be effective at work.  TAG creates, facilitates and enhances hostility defendant has subjected plaintiffs to by impairing the ability of plaintiffs to oppose and or mitigate that hostility and by creating and intensifying feelings of helplessness in the face of defendant's hostility.

40.  TAG status allows, and has allowed and facilitated, Chair Crognale, and others

who have tolerated and/or engaged in various forms of discrimination/harassment to exercise an inordinate amount of control, in the absence of meaningful input and/or participation from plaintiffs and other professors similarly situated, who did contribute such input and participation prior to implementation of TAG in October, 2020. TAG status has interfered, and continues to interfere, with plaintiffs' ability to oppose national origin based-or race-based harassment/discrimination directed at themselves, co-employees and students whom they mentor.  UNR has used TAG status to facilitate harassment, actionable per Title VII and Title IX, e.g., to limit plaintiffs input into how the Program should be operated, as well as to chill the willingness of plaintiffs, other employees and Program graduate students to complaint of actions and/or statements which are regarded as violating Title VII and/or Title IX.

41. UNR has been aware TAG is being used, or alternatively is attended by the de facto potential effect, of intimidating plaintiffs and the Program students, as well as materially curtailing plaintiffs' ability to participate in important decisions regarding the operation of the Program, since shortly after the Program was placed in TAG status in November, 2020.  These effects constitute retaliatory hostility, actionable per Title VII.  UNR has been likewise aware, since the end of 2021, it has failed to comply with various material requirements, compliance therewith is mandatory per TAG.  UNR has been aware, at least as early as the end of 2021 that TAG status is perceived by a number of faculty members, including plaintiff, as a form of retaliatory hostility.  UNR was placed on explicit, detailed and unequivocal notice of these circumstances, procedural deficiencies and perceptions on or about March 29, 2023 per receipt of the External Review Report.  The Report reads in part:

> Of note, the Clinical Psychology program was placed under Temporary Administrative Governance (TAG) by the department's prior dean, who we were told is now the provost.  The current dean of the College of Science indicated that TAG was implemented due to "a decade of issues".  One of the consequences of TAG is that decisions about the Clinical Psychology program are made with the Dean's office, ***reportedly in consultation with the Department chair*** and DCT of the Clinical Psychology program.
>
> . . . .
>
> The same Clinical Psychology faculty noted that they were unclear as to why they were in TAG.  These faculty also indicated that TAG was "illegitimate", adding that the Clinical Psychology program "didn't deserve it" and that the Clinical Psychology

faculty were not informed as to why they were in TAG, nor were annual reviews ever completed, as required by UNR rules. These faculty also indicated that "upper administration is not adhering to the administrative code" and that "due process is completely ignored". One faculty member added that the were "canceled" from faculty search committees. These faculty indicated that they have "never been provided with information about what we did wrong or any charges against us related to TAG", indicating that the only received a "vague memo on the implementation of TAG". These faculty members indicated that the announcement about TAG was "very punitive and shaming, rather than being solution focused".

External Review Report, p.14 (emphasis added).

Notwithstanding such notice, and additional notice from complaints, etc., UNR has failed to implement timely and meaningful measures to dissipate TAG status. Likewise, UNR has failed to provide adequate information to plaintiffs so as to, for example, inform plaintiff why TAG status has been imposed, what requirements must be met for TAG status to be lifted, how plaintiffs can assist in that process, etc. These failures and lapses, including failure to abide by TAG requirements, e.g., filing annual reports constitute forms of retaliatory hostility, in addition to the daily negative effects attendant to TAG, which have increased the hostility, actionable per Title VII, which plaintiffs have endured, and continue to endure.

42. In order to facilitate maintenance of TAG status, for the illegitimate and actionable (per Title VII) purpose of continuing to subject plaintiffs to retaliatory hostility, both via the very existence of TAG status and/or its attendant effects, defendant UNR failed to inform its accrediting entity, the American Psychological Association (hereinafter "APA"), as required per UNR's relationship with the APA. Upon information and belief, the APA was entitled to rely, and did so rely, to its potential detriment (e.g., potential damage to the APA's reputation, status and/or legitimacy) on UNR's deliberate failure to inform the APA of the material fact the Program had been placed in TAG, and the material facts, *including the extraordinary duration of severe and dysfunctional toxicity/hostility - as a result of deliberate inaction; Chair Crognale's stated aversion to further investigations, especially any conduct by an independent agency; and UNR's intent to resolve the toxic situation by effecting plaintiffs' departure - either per the fabricated and bogus results of retaliatory investigations or constructive discharges.* UNR's failure to report is memorialized in the External Review and Report, which reads in part:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

    1.  The Clinical Psychology program has been placed into Temporary Administrative Governance (TAG); however, the accrediting body for the Clinical Psychology program, the American Psychological Association (APA), has not been notified.  It is critical that the Clinical Psychology program leadership informs APA of not only the program's position under TAG, but also the changes in DCT *as well as the significant problems within the program that has led to TAG*.

External Review and Report, p.19 (emphasis added).

The failure by UNR to inform the APA of placement of the Program in TAG status, and "the significant problems within the program that has led to TAG" is the result of a calculated decision by UNR, made and followed since November, 2020 for a number of illegitimate and actionable (per Title VII) purposes, e.g., subjecting plaintiffs to long-term retaliatory hostility over, at least, approximately 28 months following November, 2020; continuing to forestall, as expressed by Chair Crognale, an independent investigation for the purpose of determining which persons are primarily responsible for decades of dysfunctional toxicity/hostility in the Clinical Psychology Program; an investigation regarding how and why UNR has permitted 25 to 30 years of toxicity/hostility in the Program; and being compelled, per a prompt, thorough and impartial investigation to direct appropriate discipline at the persons culpable for initiating and maintaining dysfunctional toxicity/hostility within the Clinical Psychology program.  UNR deliberately forestalled from informing the APA, while knowingly benefitting from continuing accreditation from the APA, as a direct result of being conscious of the fact Chair Crognale, Provost Thompson, etc. are primarily culpable for toxicity/hostility and the resultant division and problems, and to avoid having to act on that knowledge in accord with its own policies, Title VII, Title IX and the requirements and conditions UNR anticipated the APA would insist upon as predicate conditions to maintaining full accreditation.  ***UNR's consciousness of guilt regarding having subjected plaintiffs to myriad forms of gender-based harassment/discrimination, national origin/race-based harassment/discrimination, retaliatory hostility and acts of retaliation, and its willingness to indulge in dishonesty, is self-evident per the apparent fraud by omission UNR perpetrated against the American Psychology Association for, at least, about 28 months.***  (Plaintiffs are not privy to information re if, and when, UNR informed the APA of the existence of TAG status and the circumstances

which necessitated imposition of TAG.  Approximately 28 months elapsed from early November, 2020 to the end of March, 2023).

43.  Plaintiffs have been aware, for approximately the last two years, of UNR's apparent fraud by omission and/or commission, directed at the APA, and also, consequentially at the graduate students within the Program and the Psychology Department.   Plaintiffs have reasonably inferred, based on that awareness and other facts and circumstances alleged herein, that decision-makers at UNR harbor steadfast and determined retaliatory hostility, actionable per Title VII, against them, e.g., in order to successfully implement plaintiffs' departure from UNR's employ, and other punish plaintiffs, UNR is willing to go to extraordinary lengths, including fraud by omission against the APA, and there imperil UNR's accreditation. Consequently, UNR appears to have engaged in systemic fraud by omission against all graduate students intent on obtaining advanced degrees in psychology, and undergraduate students majoring in psychology.  That is, UNR was possessed of a duty to act diligently and honestly so as to avoid imperiling accreditation by the APA.  UNR was possessed of a duty to promptly and accurately inform persons relying on maintenance of accreditation by the APA, of any material risk to that accreditation.  Such persons appear to include undergraduates majoring or minoring in psychology, or considering doing so; graduate students seeking advanced degrees studying in the Psychology Department; and faculty members, including plaintiffs, working in the Psychology Department – all of whom predictably and likely would suffer material detriment to their careers if their Program's accreditation was lost outright, and/or materially and publicly compromised.  UNR's apparent fraud by omission, directed at the APA, and the potential loss and/or compromise of accreditation, also had the capability to materially harm all those persons who have been issued academic degrees in psychology by UNR.  UNR's apparent fraud by omission, directed at the APA, its apparent fraud by omission directed at its own employees and students, and its apparent callousness regarding the potential for harming all those who have obtained psychology degrees issued by UNR, caused plaintiffs to reasonably infer, and conclude, UNR harbored, and continues to harbor, an extraordinary determination to successfully retaliate against them because they opposed what they reasonably and legitimately

Page 29

perceived to be harassment and/or discrimination which likely violated Title VII and/or Title IX - and/or because of Drs. Benuto gender and race, and Dr. Fisher's gender. UNR thereby, as herein alleged per this paragraph, increased the hostility plaintiffs endured.

44. Upon information and belief, plaintiffs allege UNR committed other forms of apparent fraud, directed at the APA, both by commission and omission. Such fraud directly and materially harmed plaintiffs by allowing defendant to enjoy the benefit of implicit ratification of its past discriminatory conduct, and enabled defendant to continue to discriminate against plaintiffs and others, e.g., graduate students in the Clinical Psychology Program. For instance, Director Kwon told APA site visitors that the Program had been making decisions for itself, when in fact many important material decisions had been made by the TAG Administrator, especially during the period defendant UNR concealed TAG status from the APA. Director Kwon and Chair Crognale, upon information and belief, falsely ascribed fault to plaintiffs for various Program circumstances and problems to plaintiffs. UNR deceived the APA as to other various material matters as well, e.g., UNR engaged in blatant deceit by claiming that faculty Program relationships were "collegial and relaxed". See, in contrast, Chair Crognale's Response to the External Review Report and/or documents related to placement of the Clinical Psychology Program in TAG, and the self-evident TAG status. ***UNR defrauded the APA, by commission and omission for the purpose of maintained, unsullied, APA accreditation, and with the effect of facilitating UNR's ability to continue to discriminate against plaintiffs and others.***

45. Chair Crognale confirmed UNR's failure to timely notify the APA in his Response.

*The program's DCT has been in touch with the Director of the Office of Program Consultation and Accreditation at APA, Jacqueline Wall, and spoke with her on 5/24/23 to discuss the issues related to TAG. He has been in touch with the department chair and the college dean about the recommendations that Dr. Wall provided. Importantly, Dr. Wall noted that timely notification of significant program events is generally preferred, but delayed notification to APA is justified in complex situations such as the one that has led to TAG. The DCT already informed APA of the change in program leadership the first day he began at UNR, on 8/1/23.*

Chair Crognale's "Response to the External Committee . . ." p.9 (slanted emphasis in original, darkened emphasis not replicated).

Absent from Chair Crognale's Response is confirmation UNR has informed the APA of the

details attendant to the extraordinarily long, 25 - 30 year course of hostility, alleged by Chair Crognale.  Also missing is any explanation why, if this situation is so complex, Chair Crognale opposed further investigation thereof.  ***Chair Crognale implicitly admitted UNR first became aware of a plausible, apparently unwritten, justification for foregoing from informing its accrediting entity only on May 24, 2023 - approximately two and one-half years after placing the Clinical Psychology Program into TAG.***  Defendant UNR, in order to attempt to conceal its deceitful and dishonest conduct, prevented plaintiff O'Donohue from meeting with APA investigators.  This constituted an act of retaliatory hostility, and also evidences consciousness of guilt by UNR.

46.  Notwithstanding the enhanced authority and control which TAG confers on UNR, e.g., on Chair Crognale Provost Thompson, and other highly placed employees, and notwithstanding actual and/or constructive knowledge imparted to these individual via the 2023 External Review Report, multiple complaints from plaintiffs, other employees and students, personal observation, and other sources, UNR has failed to further, properly investigate the intense, ongoing and ambient toxicity/hostility described the External Report and confirmed in writing by Chair Crognale, and/or to otherwise prevent or remedy manifestations of that toxicity/hostility.  These individuals, including Chair Crognale and Provost Thompson, have so failed notwithstanding being possessed of affirmative obligations to act, per UNR's policies and procedures and by virtue of the duties and authority which attend their respective positions, as well as by the provisions of Title VII and Title IX.

47.  UNR has consciously and deliberately refused, and continues to consciously refuse to make any meaningful attempts to remedy known ongoing intense hostility in the Program; to redress manifestations and/or effects of prior acts of discrimination and/or retaliation; and to prevent further acts of discrimination and/or retaliation.  UNR continues on this course despite being aware of the contents of the External Report; Chair Crognale's opposition to any further outside investigations; the departure of a number of valued Program employees (ascribed by Chair Crognale and others to the long-term (according to Chair Crognale 25-30 years toxicity)); Chair Crognale's unequivocal confirmation of intense hostility of an extraordinary duration;

numerous complaints by plaintiffs, other employees and students; Chair Crognale's clear expression of intent to refrain from meaningful remedial action, notwithstanding his duties and responsibilities as Chair of the Department of Psychology, but to instead watch, wait and analyze - with the obvious intention of attempting to exploit any alleged mistake or misconduct by any of the plaintiffs so as to further retaliate against plaintiffs; the maintenance of what is supposed to be a short-term , curative measure, i.e., TAG status; and withholding various forms of support which is customary and obligatory per the implied good faith and fair dealing that attends every employment contract - in the stead of such support plaintiffs have been subjected to excessive scrutiny, other forms of retaliatory hostility as alleged herein, and acts of retaliation, as alleged herein.

48. In the Spring of 2023, the Program faculty met with two graduate Program representatives pursuant to a survey the students conducted regarding sexism and racism which they perceived as manifesting the Program on a regular basis. For example, the survey indicated Prof. Weierich "discriminates against people of color, and women. The Director of Clinical Training, Paul Kwon, was implicated regarding failing to take proper investigatory and remedial measures (as required by UNR's policies and the law) and instead has pressured students who complained of discrimination to confront the alleged perpetrators; etc. Plaintiffs Benuto and O'Donohue, after meeting with the students and reading the results of their survey, attempt to open dialogues with their colleagues in the Program in order to foment possible solutions which would redress problems of sexism and racism in the Program. TAG Administrator, Katherine McCall, learned of a scheduled meeting which plaintiffs Benuto and O'Donohue intended to participate with Program Students and other Program faculty Members. TAG Administrator McCall responded by using her supervisory authority to direct no such meeting be conducted. After forbidding plaintiffs Benuto and O'Donohue from attempting to explore ways in which remedy sexism and racism identified by the students' survey, UNR failed to take any action to remediate such possible sexism and/or racism. Upon information and belief, plaintiffs alleged UNR failed to inform the external auditors and/or the APA of the content/substance of the "Student Burnout Survey Spring 2023". Plaintiffs, at all relevant

times herein mentioned, were aware of this failure, which they regarded as deliberated, and as having been engaged in by UNR for the purpose of facilitating the continuation of sexual/racial and/or retaliatory hostility by UNR.

49. UNR was under an affirmative obligation to informal the external auditors, and the APA of the contents and/or substance of the "Student Burnout Survey Spring 2023," (herein "Survey"), and to otherwise promptly, thoroughly investigate the allegations posited therein, and to implement timely and/or adequate remedial/preventive action, as reasonably required. UNR failed to take any such actions. The Survey placed defendant UNR on notice of the need for prompt, thorough and impartial investigations, and of the necessity of effective remedial and preventive actions - sufficient to properly redress sexual and/or race-based discrimination, and to prevent the same. UNR ignored that notice and failed to investigate and/or to take any such action.

50. The Survey provided notice re such matters as (1) the effectiveness and excellent performance of plaintiffs; (2) discrimination and bullying by faculty members such as Prof. Marianne Weierich; (3) the failure of Director Kwon to properly address discrimination, e.g., he told students to directly confront faculty such as Prof. Weierich in the stead of initiating an investigation, and then taking remedial action; (4) failure to provide the "Mikawa" position (a position funded for the benefit of minority students) to minority students; (5) a pattern of patronizing minority students participating in the Clinical Psychology Program; (6) allegations that minority Program students were underpaid and overworked: (7) fears harbored by minority students they would be "silenced" and subjected to intimidation/retaliation if they complained of discriminatory conduct; (8) the fact a number of minority students (racial) perceived they had been subjected to discrimination based on race, and would be subjected to further discrimination if they complained; (9) the need for the Program to take race-based discrimination, and complaints thereof, seriously; (10) the need for " . . . a serious discussion surrounding Mariann Weierich as one of the biggest causes of burnout and low student morale . . . " (11) the need to remove the Diversity Chair; (12) the need to clearly articulate the grievance policy; (13) the fact Program students "are being bullied, harassed, and discriminated

against and nothing has been done"; (14) the systemic dissatisfaction of the graduate students; etc.

51.  The need to conduct a thorough and fair investigation, re the possible existence of a sex-based and/or race-based hostile work/student environment, per Title VII, Title IX, and defendant's policies/promises, was confirmed and magnified per the Survey.  Notwithstanding this additional notice, UNR failed to conduct a prompt, reasonable, fair and/or thorough investigation - and/or to otherwise remedy problems arising from race-based and/or sex based animus, as alleged and/or alluded to in the Survey, and/or by plaintiffs.

52.  The action of TAG Administrator McCall, in the Spring of 2023, was consistent with Director of Clinical, Paul Kwon's conduct in the Fall of 2022.  Director Kwon fielded complaints from a number of Program graduate students re perceived racist conduct and statements, indulged in Professor of Psychology (a Program employee) Marianne Weierich. Rather than investigate, or cause an investigation of the validity of the students' complaints to be conducted, Director Kwon chilled the students' willingness to proceed, per UNR's policies, so as to attempt to remedy any racist conduct or statements.  Director Kwon intimidated the students by informing them the TAG Administrator, who would be involved in any investigation and any remedial or disciplinary action attendant thereto, was a good friend of Professor Weierich.  The students responded by forestalling from filing formal complaints of perceived racism. Director Kwon was possessed, per UNR's policies, of a duty to promptly report the students' concerns and informal complaints which were communicated to him by the approximately six Program students, to UNR Title IX Office.  Upon information and belief, Director Kwon failed to do so.  Alternatively, if Director Kwon did make the required report, the Title IX failed to implement a prompt investigation, or otherwise meaningfully attempt to redress the racism which the students perceived.

53.  Instead of attempting to redress and mitigate known and ambient hostility which is alleged to sound in discriminatory and retaliatory animus, UNR has embarked on a course of retaliation and retaliatory hostility which includes, (1) repeated and unwarranted investigations directed at plaintiffs Benuto & O'Donohue; (2) maintenance of TAG status (sans meaningful

efforts to resolve that status), and all of the attendant adverse effects which plaintiffs suffer from pursuant thereto; (3) attempts to breach plaintiffs' attorney-client relationships via ex parte contact; (4) failing to timely investigate complaints of discrimination, including retaliatory hostility, made by plaintiffs and others, including students; (5) attempting to breach complaining students' attorney-client relationships; (6) failing to investigate open violations of its own policies, e.g., Chair Crognale's clear statements which express refusal to discharge his duty to redress toxicity in his Program; (7) failing to investigate Chair Crognale's failure, for approximately the last 6 years of his tenure as Chair of the Program, to meaningfully attempt to redress the toxicity which he asserts exists;  (8) concealing from applicants to the Program the extraordinary, continuing hostility which Chair Crognale admits; (9) failing to make reasonable inquiry, and then to consider, what effects admitted long-term toxicity/hostility has had upon the ability of those being investigated, e.g., whether the abilities of those investigated to properly discharge their job duties have been adversely affected, and in what ways and to what degree, by the potentially actionable hostility UNR has permitted to exist, for many years; (10) threatening plaintiffs, and graduate students who plaintiffs advise/mentor and who have likewise complained of discrimination in order to coerce them to grant UNR the ability to use interviews, *which are supposed to be conducted for the purpose of investigating the merits of the complaints made by plaintiffs and the students associated with them*, against the plaintiffs and/or complaining students in anticipated/prospective litigation, UNR will forestall from conducting thorough investigations, and then forestall from remedying complained of discrimination; (11) deliberately conducting inadequate investigations of plaintiffs' (and students') complaints of discrimination (including retaliatory hostility), pursuant to the threat; (12) failing to investigate complaints of discrimination/retaliatory hostility made by plaintiffs and/or students mentored by plaintiffs; (13) failing to timely and/or thoroughly investigate complaints of discrimination/retaliatory hostility, including Title IX complaints; (14) failing to investigate/remedy/prevent  known acts of discrimination and/or retaliation hostility, e.g., Chair Crognale's recent public display of intense anger directed at Dr. Benuto; (15) via the perversion and weaponization of its duty to fairly investigate, implicitly but clearly renouncing the anti-

Page 35

discrimination policies UNR promised plaintiffs would protect them, and thereby communicating to plaintiffs they are very vulnerable to future acts of discrimination/retaliation; (16) via the open perversion and weaponization of the duty to investigate a Title VII and/or Title IX complaint, intimidating or attempting to intimidate plaintiffs, other potential complainants and/or potential witnesses - in a blatant manner whereby plaintiffs predictably became cognizant of; (17) refusing to provide plaintiffs O'Donohue and Benuto adequate notice of the charges/wrongdoing re which they were investigated and/or interviewed - and thereby interfering with their right to effective legal representation; (18) changing and increasing plaintiffs O'Donohue and Fisher's work duties in 2023, e.g., terminating plaintiff O'Donohue's duties as Director of the Psychological Services Center and increasing plaintiff Fisher's teaching duties;  (19) toleration of hate speech on campus, i.e., students entering campus residential housing in 2023-24, in which they did not live, but which were known to house substantial numbers of African-American students, and posting "ni__er" on whiteboards and/or shouting "ni__er" (UNR's Dean of Housing refused to take adequate remedial action based on the fictive excuse this conduct constituted protected speech); (20) the termination of Dr. O'Donohue position as Director of Psychological Service on January 1, 2024; and (21) an audit directed at a Voca Grant in which Drs. O'Donohue and Benuto were involved in, and which was conducted so as to manufacture false accusations of misconduct, alleged to have been committed by plaintiffs O'Donohue and Benuto.  Plaintiffs became aware of the UNR's calculated toleration of hate speech and regarded UNR's conduct as further evidence of the sham character of UNR's written anti-discrimination policies, and of UNR's actual, de facto willingness to tolerate racist conduct and speech.

54.  In 2024 UNR expressed a clear intent, via correspondence authored by an investigatory acting on behalf of UNR, and primarily by UNR's General Counsel, to weaponize investigations attendant to plaintiffs' complaints, and/or the Title IX complaints of students,  of harassment/discrimination.  That is UNR communicated threats, to weaponize investigations of plaintiffs' complaints of sexual and/or racial harassment/related retaliatory hostility/acts of retaliation/sexual and/or racial discrimination by threatening to forego complete investigations

of those complaints unless plaintiffs agreed to allow statements made by plaintiffs during investigatory interviews against themselves, and their co-plaintiffs, in litigation (which UNR knew, or should have known, was contemplated by plaintiffs and their attorneys), and by threatening, implicitly and/or explicitly, to fail to adequately remedy the matters and situations plaintiffs complained of.  UNR consummated, i.e., fulfilled or followed through on these threats by deliberately conducting inadequate investigations, i.e., foregoing from interviewing plaintiffs and/or witnesses likewise represented by counsel who refused to be interviewed without a promise by UNR their statements would not be used against themselves.  UNR further fulfilled its threats by failing to implement timely and adequate preventive and remedial actions relative to the matters and situations (involving sexual and racial harassment, retaliatory hostility, acts of retaliation and/or acts of discrimination) of which plaintiffs complained.

55.  On September 19, 2024, Investigator Lauren Starnes, in response to plaintiff Benuto's refusal to allow her interview, per *her Title VII complaint to be used against her in prospective litigation*, wrote in material part, to Dr. Benuto's attorneys:

> You and Dr. Benuto should also be aware that if Dr. Benuto does not participate in this investigation, I will not be able to fully include Dr. Benuto's perspective related to her allegations.

56.  UNR's conduct, as alleged in the preceding paragraphs, violated Nevada law (see, e.g., Chapter 613 of the Nevada Revised Statutes), 42 U.S.C. 2000e, et seq. (aka "Title VII), public policy and the letter and/or spirit of its own policies - which UNR promised, explicitly and/or implicitly, it would enforce and abide by for the purpose of preventing and redressing various forms of discrimination/retaliation, and otherwise protecting those who complained of various forms of sexual and/or racial discrimination/retaliation.  *See, e.g.,* Chapter 6 (Rules and Disciplinary Procedures for Faculty Except DRI), of Title 2 (Nevada System of Higher Education).  Section 6.8.2(a), which reads in part: "The administrative officer shall investigate complaints ***with the purpose of clarifying the facts and the positions taken by the parties.***" Emphasis added.

57.  None of the documents which memorialize policies and/or procedures relating to Title VII related complaints which UNR publishes and/or provides to employees inform, or

imply, that UNR will conduct investigations of complaints for the purpose of preparing to prevail in any litigation which a complaint might bring. To the contrary, UNR routinely promises, as it promised plaintiffs, explicitly and/or implicitly, investigations of Title VII related complaints, including interviews of complainants, will be conducted in good faith, for the purpose of fomenting effective preventive and remedial solutions and responses to conduct violative of its policies and/or Nevada law and federal law. Nor did UNR previously (prior to retention of counsel by plaintiffs) communicate to plaintiffs, or almost all of its other employees, in any way, an intent to conduct interviews of Title VII complainants for the self-serving purpose of using statements obtained thereby, against Title VII complainants in prospective litigation.

58. UNR is estopped as a result of its promises to plaintiffs, upon which plaintiffs reasonably and predictably relied from asserting any arguments and/or positions to the effect it was entitled to obtain the right and/or ability to use statements made during interviews of plaintiffs, conducted per Title VII related investigations of plaintiffs' complaints, against plaintiffs. UNR knew, or should have known, plaintiffs would likely rely on the policies, procedures and/or statements of intent which UNR published and/or otherwise communicated to plaintiffs regarding investigations relating to Title VII related matters. UNR knew plaintiffs were entitled to rely on defendant UNR to comply in good faith, consistent with the letter and spirit of its policies, and other communications regarding Title VII related investigations, and intended to induce such reliance by plaintiffs. Each of the plaintiffs did so rely, to their detriment, as alleged herein.

59. Any diminution, deficiency and/or lapse in the work performance or conduct/statements of any of the plaintiffs' is subject to being legitimately ascribed, in whole or material part, to the existence of long-term and intense hostility sounding in discriminatory and/or retaliatory hostility (and related acts and statements) directly related to gender animus and/or national origin/racial animus and/or plaintiffs' opposition (actual and/or perceived) thereto. That is, any such diminution, deficiency, lapse and/or conduct which might otherwise be considered as a basis for legitimate investigations of plaintiffs, and/or attendant discipline,

are subject to being considered as reasonable and predictable responses to discrimination, retaliatory hostility, acts of retaliation and/or the long-term existence of a hostile work environment - as admitted to and forcibly alleged by Chair Michael Crognale, and as known to exist (or should have been known) by all Management level employees of UNR, at all times herein mentioned.  Any and all investigations of plaintiffs should have been, in material part, directed at adducing information of how the hostility and various discriminatory acts and/or statements of which plaintiffs complained, in addition to the existence of a very toxic work environment (sounding in material part in alleged Title VII related violations) may have adversely affected plaintiffs' work performance and/or conduct.  The information and/or evidence adduced pursuant to investigatory efforts should have been materially factored by UNR when considering whether plaintiffs engaged in any form of misconduct, e.g., whether plaintiffs' conduct should be determined to have been reasonable, mitigated in whole or material part, or otherwise excused.  *See, e.g., Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S. Ct. 367 (1993) ("A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep the from advancing in their careers." ).  114 S. Ct. at 370-71; also see, *Okonowsky v. Garland,* 109 F.4th 1166 (9th Cir. 2024).

60.  UNR conducted a number of retaliatory investigations directed at plaintiffs without engaging in proper, legitimate efforts to determine the validity of plaintiffs' allegations regarding Title VII related discriminatory acts, retaliatory hostility and/or acts of retaliation - and, of course, without factoring possible causal connections to alleged diminution, deficiencies and/or lapses in plaintiffs' work performance and/or plaintiffs' conduct.   UNR, as a predicate to investigating any of the plaintiffs, was required to thoroughly investigate the genesis, character and details of the intense toxicity which Chair Crognale stated existed for the last 25 to 30 *years* in the Clinical Psychology Program which he has presided over for approximately the last six years and which he forcibly alleged continues to exist.  UNR should be deemed to have been on notice of a compelling need to investigate Chair Crognale's

allegations, and the existence and possible adverse effects of the persistent and intense toxicity/hostility in the Program by the substance of Chair Crognale's Response to the 2023 External Report.  For example, Chair Crognale did not describe any meaningful efforts which had been undertaken by UNR, or himself, to remedy the toxicity.  Chair Crognale did not describe any contemplated measures to remedy the toxicity.  To the contrary, Chair Crognale stated he did not desire any further external investigations.  Most telling, Chair Crognale, while forestalling from attempting to foment preventive and/or remedial actions, as required by Title VII, posited the implicit conclusion plaintiffs (whom he refrained from identifying) were solely, or almost entirely responsible for the intense, long-term hostility he alleged.  Chair Crognale stated his intention to delay action, sans an independent investigation. See, e.g., Chair Crognale's "Response to the Report of the External Review Committee for the Psychology Department Program review (2023)," p.12 UNR became aware of Chair Crognale's statements, articulated in his Response, either prior to the dissemination of that Response, or very shortly thereafter.  At all times herein mentioned UNR possessed actual and/or constructive notice that the contents of plaintiffs' personnel records/files directly and/or implicitly repudiate Chair Crognale's claims plaintiffs are responsible for creating and/or maintaining toxicity in the Program.  That is, by the favorable content of those records and files, and by the absence of unfavorable content, the plaintiffs' personnel files, when considering in conjunction with Chair Crognale's allegations, memorialized in hie Response to the 2023 to the External Review Report, put UNR on notice of the need for an intense and thorough investigation into the 25-30 year course of intense toxicity, which Chair Crognale alleged to be ongoing.  UNR was also placed on notice of Chair Crognale's abandonment of his duties as Chair to remedy that toxicity, and in lieu thereof of his stated, malevolent and retaliatory intent to somehow use his authority as Chair to harm plaintiffs and their careers, and to otherwise continue to manifest retaliatory hostility against plaintiffs.  The clarity of notice to UNR, and the attendant obvious and compelling need to conduct a thorough and fair investigation, and then prevent and remedy further hostility and manifestations thereof, was intensified by knowledge of facts and circumstances UNR already possessed.  For example UNR knew of the allegations relating to

Page 40

hostility in the Program and knew of severe dysfunction as a result thereof, and related thereto. Such had resulted in the Program being placed on TAG status - a status which by its very nature is supposed to be ***temporary*** - for years.   UNR ratified Chair Crognale's conduct; knowingly acted in concert with him re his intent to forestall from conducting an investigation which was obviously required per law and UNR's policies; knowingly permitted ambient Title VII hostility to persist; and abandoned the policies which UNR promised plaintiffs would protect them.  UNR knowingly conducted inadequate investigations, directed at plaintiffs, and thereby indulged retaliatory and/or discriminatory animus against plaintiffs.  These retaliatory investigations have directly interfered with the ability of plaintiffs to discharge their work-related duties.

61.  In the stead of attempting to properly and lawfully remedy the Title VII related toxicity and hostility which Chair Crognale forcefully and unequivocally described, UNR opted to orchestrate a course of retaliatory hostility and retaliation directed at plaintiffs, for the purpose of effecting their departure from its employ.  In lieu of investigating which persons or person was responsible for the long-term Title VII related hostility described by Chair Crognale, UNR ignored the contents of the 2023 External Review Report, Chair Crognale's behavior and statements, TAG status, other complaints, indications and evidence probative of culpability for the Title VII related hostility, plaintiffs' employment records, and decided to retaliate against plaintiffs by, for instance, launching biased and deliberately incomplete investigations directed at plaintiffs, while refusing to provide plaintiffs with proper and/or adequate notice of the substance and details of why plaintiffs were being investigated.

62.  UNR's initiation and/or conduct of the various investigations, directed at plaintiffs, constitute acts of retaliation and/or retaliatory hostility.  The manner in which UNR conducted various investigations constituted retaliatory hostility.  For example, in about December of 2024, UNR commenced an investigation against plaintiff Benuto.  A material focus of that investigation was plaintiff Benuto's FMLA leave attendant to a pregnancy. The initiation of that investigation constituted a discrete act of retaliation.  The manner in which UNR conducted the investigation constituted retaliatory hostility and/or gender-based hostility.

63.  On December 31, 2024, UNR issued a "Chapter 6 Charging Letter" directed at plaintiff Benuto.  That Charging Letter memorializes retaliatory hostility and/or the retaliatory character of the investigation and the charges, directed at plaintiff Benuto.  The Charging Letter reads in material part:

> On April 16, 2024, you gave birth while you were on contract for Spring Semester 2024 and were therefore obligated to keep the University apprised of your work status. ***While others believe that you gave birth by Cesarean section, you refused to confirm during our interview. . . .***

December 31, 2024, Charging Letter, first paragraph, p.2 (emphasis added).

64.  During plaintiff Benuto's December, 2024, interview, plaintiff inquired, per her counsel, why defendant was inquiring of plaintiff whether she gave birth per a Cesarean procedure.  Defendant failed to provide an adequate answer, or to otherwise identify a legitimate basis to justify such inquiry - even though plaintiff's counsel specifically cited Federal Rule of Evidence 412 and otherwise explained the inquiry encompassed information within the ambit of Rule 412, which therefore required defendant to make a showing, i.e., identify a legitimate basis for an inquiry which delved into plaintiff's sexually related medical history.

65. The inquiry defendant made into plaintiff Benuto's medical/sexual history constituted gender or sexual based, and/or Title VII retaliatory hostility.  The failure by UNR to posit a plausible explanation for the inquiry constituted gender or sexual based and/or retaliatory hostility.  Use of plaintiff Benuto's refusal to confirm or deny whether she underwent a Caesarian procedure to attempt to legitimize a Charging Letter constitutes an act of gender and/or retaliatory based retaliatory hostility.  UNR engaged in the initial inquiry, and reiterated that inquiry, notwithstanding the benefit of being informed of the applicability of Federal Rule of Evidence 412, and then issued the Charging Letter while either failing to properly consider FRE 412, or ignoring the applicability of FRE 412.

66.  Each investigation directed at any of the plaintiffs, and the calculated biased manner in which those investigations were conducted, markedly contributed and intensified actionable hostility which each plaintiff experienced - regardless whether a particular plaintiff

1  was the subject of a particular investigation.  That is, the plaintiffs each quickly learned of
2  investigations of other plaintiffs, and the calculated/retaliatory inadequacy thereof, but which
3  were not directed at themselves.  Each plaintiff reasonably perceived that defendant UNR was,
4  via each deliberately defective investigation, manifesting a determined and persistent
5  retaliatory/discriminatory animus against each of them, and as a group.  Each plaintiff
6  reasonably apprehended, based on these circumstances, and the other facts and circumstances
7  alleged herein, that UNR's policies would not protect them; those policies were, in fact, a
8  sham; and UNR would continue to harass and retaliate against each of them, in violation of
9  UNR's policies and/or state and federal law - e.g., Title VII.  Each plaintiff reasonably
10 apprehended UNR had conferred upon individuals, such as Chair Crognale, de facto explicit or
11 tacit permission and encouragement to manifest Title VII related retaliatory hostility toward
12 them,  and to engage, with impunity, in acts of discrimination and/or retaliation.  This
13 knowledge increased and intensified plaintiffs' emotional distress and feelings of vulnerability
14 and/or helplessness.  Plaintiffs have been subjected to various forms of retaliatory hostility,
15 including excessive scrutiny, in response to their opposition to discrimination directed at
16 themselves and graduate students associated with them.  Plaintiffs have been denied support for
17 their work-related tasks, which would otherwise have been provided to them, but for,
18 retaliatory animus and/or race-based and gender-based animus (violative of Title VII), harbored
19 and/or manifested by defendant.

20     67.  All of the harassing conduct and/or statements sounding in material part in
21 sexual/gender and/or national origin-based animus, as well as all such conduct and/or
22 statements sounding in retaliatory animus (see, e.g., *Draper v. Coeur Rochester*, 147 F.3d 1104
23 (9th Cir. 1998), alleged herein is actionable per the "continuing action doctrine," as reiterated by
24 the United States Supreme Court.  See, *National Railroad Passenger Corporation v. Morgan*,
25 536 U.S. 101, 122 S. Ct. 2061 (2002).  That is, the acts and statements constituting the courses
26 of harassment, directed at the plaintiffs, collectively and individually, as well as such directed
27 at students plaintiffs mentored, were of sufficient frequency and similarity, and were motivated
28 by such common, or even identical motives, actionable based on Title VII and/or Title IX,

Page 43

harbored by those who engaged in manifesting race-based, gender or sex-based and retaliatory-based hostility, as to justify and/or necessitate application of the continuing action doctrine. That doctrine should be applied to effectuate and fulfill the remedial purposes of Title VII, and to otherwise achieve a just and fair resolution on the merits per FRCP 1.

68.  UNR is equitably estopped from denying the continuing action doctrine should be applied because, for example, Chair Crognale concealed and denied he acted per gender animus, national origin/race animus and/or retaliatory animus.  See, e.g., emails authored by Chair Crognale, and in particular, Chair Crognale's Response to the 2023 External Review Report.  At all times herein, Chair Crognale acted per his authority as Chair of the Department of Psychology.  His actions and statements are to be deemed those of defendant UNR/State of Nevada.  Further, as alleged herein, defendant ratified the statements and actions of Chair Crognale, as well as those of the other individual actors named herein.

69.  In addition to permitting gender and/or national origin/race-based harassment/discrimination to be directed at plaintiffs, other employees and students of the Clinical Psychology Program, UNR has consistently deceived graduate students who are prospective and actual applicants to the Program.  UNR maintains such deception re students after they join the Program.  Some of UNR's deceptive conduct is memorialized by the March 29, 2023 External Review Report, authored by External Reviewers Drs. Carol A. Pilrim, Per B. Sederberg and Jason J. Washburn.  The External Review Report reads in part:

> In addition to the limited stipends mentioned above, recruitment will likely be hampered by the persistent conflicts among the Clinical Psychology faculty.  Given the general climate and culture concerns within the program, it is notable that the Clinical Psychology program website states that "We emphasize the development of collegiality.  The relationship between faculty and students is friendly and respectful."  ***This statement and the reality of the Clinical Psychology program climate and culture appear to be at odds.  As noted by a UNR administrator, "it is bad advertisement when a current graduate student cries during interviews with applicants".***

2023 External Review Report, p.3, last paragraph (emphasis added).

Plaintiffs have been aware, for years, of UNR's practice of routinely deceiving applicants and students admitted to the Clinical Psychology Program, by commission and omission, regarding the long-term and continuing course of gender-based, national origin/race-based and retaliation

based hostility, as well as acts of retaliation. Plaintiffs regard the statements quoted above to be substantially accurate.  Plaintiffs have also been aware, for years, of the possibility students whom they mentor and/or advise may likely suffer as the result of hostility directed at such students as a direct result of plaintiffs' involvement with those students.  This awareness regarding UNR's persistent dishonesty, and the hostility itself, and the possibility of students suffering as a result thereof, and the likelihood of students suffering as the result of association with plaintiffs has created additional hostility re which plaintiffs have endured, and continue to endure.

70.  Chair Crognale implicitly admitted UNR defrauded (or at the very least misled) by omission, applicants to the Clinical Psychology Program, as well as those applicants who became students.  He did not repudiate the proposition, integral to the excerpt of the External Review and Report, quoted in the preceding paragraph.  Instead, Chair Crognale implicitly admitted UNR misled applicants and students by studied omission of known, material facts. When juxtaposed to UNR's bogus positive portrayals, unaccompanied by accurate, candid and adverse information -  fraud by omission directed at applicants, graduate students, ***and the American Psychological Association,*** is readily inferred.   Some of the omitted facts were disclosed, but only, apparently, when Chair Crognale perceived disclosure to inure to his own advantage, and disclosure occurred, belatedly, only to the External Auditors - as opposed to applicants, graduate students and/or the American Psychological Association.  Dr. Crognale's Response reads in part:

> *The problems in Clinical Psychology span more than 25-30 years.  Evidence for this can be seen in our previous program review.  Attributing these problem entirely to the temporally [sic "temporarily"?] appointed DCT [Dr. Follette] is misleading and misguided.  Dr. Follette agreed to serve as DCT after the program was put into TAG for myriad problems.  The noted clinical licensure was a temporary lapse in payment of dues and was corrected shortly after it was discovered, as such it is resolved.*

> *In addition to the former DCT, at least seven clinical faculty members have left UNR or the Clinical Psychology program (including three former DCTs and a Chair) due to the toxic and stressful environment.  These former faculty members have spoken to administration members to characterize their experience and the problems in the Clinical Psychology program.  The losses of these faculty members, along with the sustained negative impact on the graduate students is the reason why the Clinical Psychology graduate program remains in TAG.*

Chair Crognale's "Response to the Report of the External Review Committee for the Psychology Department review (2023)" Undated, p.8 (last two paragraphs), pages are not numbered (slanted emphasis in original (original accompanied by darkened emphasis, not replicated herein).

71.  Chair Crognale attempted to mislead and/or confuse the External Auditors,, e.g., Chair Crognale failed to disclose his personal responsibility for the creation and maintenance of toxicity and stress, e.g., that he had screamed at Dr. Benuto, made sexist, disparaging remarks regarding her, trivialized her complaints of gender hostility, engaged in gender hostility toward Dr. Fisher, etc.

72.  Plaintiffs have been aware, for years, that students may be "weaponized" against them by Chair Crognale, or others, pursuant to being pressured to take sides per the hostility based divisions which continued to exist in the Clinical Psychology Program.  Plaintiffs also are aware that, if students align, or are perceived to have aligned, i.e., chosen sides, with any of the plaintiffs, those students may be retaliated against - to the point at which they leave the Program or are otherwise prevented from obtaining their doctoral degrees.  This dynamic, fostered and facilitated by UNR by actions and statements alleged herein, in addition to communications plaintiffs reasonably believe are directed at students, but re which they are not privy to, constitutes another form of gender-based, national origin/race-based and/or retaliatory hostility, actionable per Title VII.

73.  UNR has been on notice of the dynamic and attendant hostility alleged herein, and potential hostility relative to plaintiffs, other employees and Program graduate students for years.  UNR was placed on formal and unequivocal notice on or about March 29, 2023, when it received the External Review Report.  That Report reads in part:

> The climate and culture of the Clinical Psychology programs appears to be highly problematic based on all available materials and interviews with administration, faculty, and students.  Interviews indicated concern that some of the accusations being made were close to a "libel level".  The fracturing of the Clinical Psychology programs into two opposed sides *is made even more problematic by concerns expressed by many individuals interviewed that graduate students have become "weaponized" in these conflicts between faculty*.  For example, some students reported that a faculty member asked graduate students in their lab to communicate their (i.e., faculty) grievances to other graduate students and faculty.  Further, faculty, administration and graduate students reported a culture in which graduate students have felt pressured to "take sides" in the conflict.

Of significant concern are student allegations of racial and sex discrimination against them by a faculty member. These allegations are documented in a recent anonymous survey conduct by Clinical Psychology students, and were reported to the external reviewers via interviews. Students noted that a faculty member was "abusive" and "intimidating" in their interactions with this individual. Several students (n=-5) reported that they made reports to the UNR Office f Equal Opportunity & Title IX; however, several students reported that they had no response from the Office despite submitting reports over a month ago. Some Clinical Psychology faculty members also stated that the program has had difficulty adjusting to a more diverse student body and that diverse students do not feel validated, supported, or safe. Students also expressed frustration that policies were not followed as other faculty knew of concerns with [14] discrimination but they did not report that information to the UNR Office of Equal Opportunity & Title IX.

External Review Report, pp.13-14 (the pages of the Report are not numbered) (emphasis added).

Notwithstanding explicit notice, quoted above, which corroborates important and material allegations by plaintiffs of harassment and/or discrimination, actionable per Title VII, UNR failed to timely, thoroughly and impartially investigate the facts and allegations memorialized by the Report - or otherwise attempt to meaningfully remediate the hostility and adverse conditions described therein. That failure has been well known to plaintiffs since shortly after March 29, 2023, and in conjunction with the hostility and conditions described in the Report, has contributed to the hostility, actionable per Title VII, plaintiffs endured and are enduring. Further, such hostility is actionable per the continuing action doctrine.

74. Plaintiffs have been routinely subject to various forms of excessive scrutiny, including audits of grants they are responsible for or involved in, and/or investigations directed at themselves, and have endured being constantly aware, for at least the last five years, that defendant, rather than providing support for their work, constantly is watching and waiting for the appearance of any mistake or deviation from its policies - so it will be able to subject them to exacting and harsh scrutiny in order to retaliate against them, and/or discriminate against them because of membership in a protected class of persons, and those associated with them to the extent defendant believes such persons, e.g., graduate students, are aligned with one or more of the plaintiffs, and therefore should be punished. Defendant wishes to retaliate against plaintiffs, and seeks to facilitate retaliation because plaintiffs have opposed what they reasonably perceive to be various forms of discrimination arising from racial, national origin

and/or gender animus.

75.  Defendant has had knowledge of all, or almost all, alleged facts, statements and circumstances alleged herein within weeks after such occurred, via complaints from plaintiffs, other employees, and/or students; and/or via knowledge acquired by management level employees.  Chair Crognale is vested with sufficient authority that his knowledge should be deemed that of defendant as of acquisition.  Further, Chair Crognale acted in concert with others, e.g., Dean, and then Provost Thompson, as did such persons as Professor Weierich. Defendant ratified, by commission and/or omission (failure to act) each and every alleged action and statement which plaintiffs contend constitute retaliatory hostility and/or acts of retaliation.

<u>First Cause of Action</u>

(Racially/Gender Hostile Work Environment)

76.  Plaintiffs hereby incorporate the allegations stated in paragraphs 1 through 75, inclusive, as well as the allegations of all other paragraphs, as though they were stated in full herein.  Only plaintiff Lorraine Benuto is bringing this cause of action.

77.  Per Title 42 U.S.C. sec. 2000e, et seq. (aka "Title VII"), and the caselaw construing and applying this body of law, especially published Ninth Circuit Court of Appeal Opinions, hostility sounding in racial animus and gender/sexual animus, as well as retaliatory hostility related to both types of harassment, should be aggregated and considered together in determining whether plaintiff Benuto's work environment was sufficiently hostile so as to be deemed actionable per Title VII, as well as for other related purposes.  *See, e.g., Lam v. University of Hawaii*, 40 F.3d 1551, 1561-62 (9th Cir. 1994); *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1416 (10th Cir. 1987).  Plaintiff Benuto's work environment, for at least the last five years, has been continuously permeated with hostility, actionable per Title VII, to the point at which the terms and/or conditions of her employment have been adversely altered to such an extent as to create liability, i.e., so as to be actionable,  per Title VII.

78.  As a direct and proximate result of being subjected to the continuing course of gender-based and race-based hostility, and associated retaliatory hostility, alleged herein,

plaintiff Benuto suffered emotional distress and associated symptoms; unwanted feelings of anger, depression and helplessness; interference with her ability to perform her professional duties; feelings of fear and intimidation; loss of enthusiasm and enjoyment for work and profession; etc.

79.  It has been necessary for plaintiff Benuto to incur costs and retain counsel in order to attempt to vindicate her federally protected right to a workplace free of gender-based and race-based hostility, and related retaliatory hostility, as alleged herein.

Second Cause of Action

(Sexually Hostile Work Environment)

80.  Plaintiffs hereby incorporate the allegations stated in paragraphs 1 through 79, inclusive, as well as those in all other paragraphs, as though the same were fully stated herein. Only plaintiff Dr. Fisher is bringing this cause of action.

81.  In addition to the gender-based hostility and related retaliatory hostility alleged above, plaintiff Fisher suffered as the result of being in a legally recognized "zone of interest" relative to her husband, plaintiff O'Donohue.  Plaintiff Fisher became aware, contemporaneously, or almost immediately, of the various acts, statements and/or omissions which caused her husband to experience his work environment as hostile, and actionable per Title VII, as well as various acts of retaliation directed at plaintiff O'Donohue, and the hostility she otherwise experienced as the result of having actionable Title VII hostility directed at herself was thereby intensified as a direct and proximate result.  Additionally, the hostility plaintiff Fisher experienced by being in the zone of interest with her husband constituted an independent form of hostility actionable per Title VII.  The hostility plaintiff Dr. Fisher experienced and endured, as alleged herein, was of sufficient intensity, duration and frequency as to be actionable per Title VII.

82.  As a direct and proximate result of being subjected to the continuing course of gender-based and zone-of-interest hostility, and related retaliatory hostility, alleged herein, plaintiff Fisher suffered emotional distress and associated symptoms; unwanted feelings of anger, depression and helplessness; interference with her ability to perform her professional

Page 49

duties; feelings of fear and intimidation; loss of enthusiasm and enjoyment re her work and profession; etc.

83. It has been necessary for plaintiff Fisher to incur costs and retain counsel in order to attempt to vindicate her federally protect right to a workplace free of gender-based hostility and retaliatory hostility, as alleged herein.

<u>Third Cause of Action</u>

(Retaliatory Hostility/Gender and Race-Based Hostility)

84. Plaintiffs hereby incorporate the allegations of paragraphs 1 through 83, inclusive, and all other allegations in other paragraphs, as though the same were fully stated herein. Only plaintiff O'Donohue is bringing this cause of action.

85. Plaintiff O'Donohue was personally subjected to a hostile work environment, as alleged herein, of sufficient severity and duration, punctuated on a frequent basis with hostile acts and statements, and cast against an ambient background of hostility, e.g., the unnecessary maintenance of TAG status and the impairments and helplessness which attended that status, so as to acquire standing to successfully bring a cause of action per Title VII. Plaintiff O'Donohue was subject to statements and derision joined in by at least management level employee of UNR, which questioned his masculine character - apparently because he opposed gender-based harassment directed at women. Plaintiff O'Donohue became aware of this offensive derision shortly after it was engaged in. This hostility permeated plaintiff O'Donohue's work environment and adversely affected the terms and conditions of his employment, and/or interfered with his ability to discharge his work-related duties to the point at which it is actionable per Title VII. Dr. O'Donohue was subjected to retaliatory hostility, as alleged herein, because he opposed race-based and gender-based forms of discrimination, as alleged herein. The hostility plaintiff O'Donohue endured was intensified by knowledge, which he acquired almost contemporaneously, of gender-based hostility, retaliatory hostility and acts of retaliation which UNR directed at his wife, plaintiff Fisher, and at graduate students whom he mentored, and who looked to him for protection from various forms of discrimination.

86.  As a direct and proximate result of being subjected to the continuing course of retaliatory hostility, and related zone of interest hostility alleged herein, plaintiff O'Donohue suffered emotional damages and associated symptoms; unwanted feelings of anger, depression and helplessness; interference with his ability to perform his professional duties; feelings of fear and intimidation; loss of enthusiasm for work and his profession; etc.

87.  It has been necessary for plaintiff O'Donohue to incur costs and retain counsel to attempt to vindicate his federally protected right to a workplace free of retaliatory hostility, gender-based and race-based hostility, and other forms of discrimination.

Fourth Cause of Action

(Retaliation - Retaliatory Audit/Investigation Re Plaintiff)

88. Plaintiffs hereby incorporate the allegations of paragraphs 1 through 87, inclusive, and all other allegations in other paragraphs, as though the same were fully stated herein.  Only plaintiff Benuto is bringing this cause of action.

89. Plaintiff Dr. Benuto was subjected to a number of acts of retaliation by defendant. One of those acts of retaliation, as alleged in Dr. Benuto's October, 2023, "Charge of Discrimination" was an audit, initiated and conducted by defendant, commencing in approximately June, 2023, of grants which Dr. Benuto was involved in, and/or, administered. The other acts of retaliation against plaintiff Benuto, and plaintiff O'Donohue, which occurred after they filed their Charges of Discrimination are integrally related, i.e., they are like or reasonably related to the retaliatory hostility and/or acts of retaliation alleged in those Charges. An investigation by the EEOC or NERC would have likely led to their discovery and consideration. Therefore, the acts of retaliation herein alleged by plaintiffs Benuto and O'Donohue, which occurred subsequent to the filing of their respective Charges of Discrimination are subject to being litigated herein.  Furthermore, defendant UNR, because of its concerted, calculated and protracted course of actionable hostility and acts of retaliation, should be estopped from objecting to litigation of subsequent acts of retaliation and/or subsequent manifestations of Title VII related hostility.

90. This audit was initiated and conducted as a direct result of retaliatory animus,

harbored and indulged in by defendant.  That retaliatory animus existed as a direct and proximate result of plaintiff Benuto's various forms of opposition to what she reasonably perceived to be forms of discrimination, indulged in by UNR, and directed at herself, the other plaintiffs and/or various graduate students in the Clinical Psychology Program whom plaintiff mentored and/or who looked to plaintiff Benuto to protect them from forms of gender and/or race-based discrimination.

91.  This retaliatory audit had the intended and predictable effect of intimidating plaintiff Benuto and chilling her willingness to oppose and/or continue to oppose what she reasonably perceived as forms of discrimination, potentially actionable per Title VII and/or Title IX.   That is, the retaliatory audit would have had the likely effect of intimidating and deterring plaintiff, other potential complainants, and/or potential witnesses who may have been able to provide corroborating testimony, probative of discrimination (including discriminatory/retaliatory animus).   In fact, it did have such an effect, although plaintiff successfully resisted such.  The audit constituted a discrete act of retaliation, as alleged in Dr. Benuto's October, 2023, Charge of Discrimination, and relative to which Dr. Benuto has exhausted, in good faith, all administrative remedies.

92.  Pursuant to manifesting retaliatory animus, defendant failed to provide plaintiff Benuto with due process, i.e., defendant UNR refused/failed to provide Dr. Benuto with specific and adequate notice of the allegations against her.

93.  As a direct and proximate result plaintiff Benuto was injured and/or harmed as alleged herein.  At all times herein mentioned, plaintiff Benuto was aware that, if any of the retaliatory investigations and/or inquiries herein alleged, resulted in a finding or findings of culpability by plaintiff Benuto, plaintiff Benuto would be subjected to severe sanctions, including termination of employment by defendant and/or severe reputational/professional damage - potentially attended by future loss of income.

94.  It has been necessary for plaintiff Benuto to incur costs and retain counsel in order to attempt to vindicate her federally protected right to a workplace free of retaliation, actionable per Title VII.

Fifth Cause of Action

(Retaliation - Retaliatory Investigation of Plaintiff)

95.   Plaintiffs hereby incorporate the allegations stated in paragraphs 1 through 94, inclusive, as well as the allegations of all other paragraphs as though they were fully stated in full herein.  Only plaintiff Lorraine Benuto is bringing this Fifth Cause of Action.

96.   Defendant subjected plaintiff Benuto to retaliation in the form of a Chapter 6 investigation, initiated on or about June 20, 2024, wherein defendant, per indulging retaliatory animus as the result of plaintiff Benuto's opposition to what she reasonably perceived as race-based and/or gender-based discrimination, investigated specious and/or fabricated allegations such as failure to comply with terms of various grants; licensing and/or supervision deficiencies/ suspected HIPPA violations, etc.  All other investigations, initiated and conducted by defendant, and directed at plaintiff Benuto, and/or other plaintiffs, were motivated by retaliatory animus, which existed because of opposition to various forms of discrimination, prohibited by Title VII, and which plaintiffs reasonably perceived as so prohibited, i.e., plaintiffs engaged in opposition, protected by Title VII.

97.   Defendant initiated and conducted this investigation for the purpose of retaliating against plaintiff Benuto because she opposed what she reasonably perceived as gender and/or race-based forms of discrimination, directed at herself and other employees and/or students of defendant - especially minority students whom Dr. Benuto mentored and/or who looked to her for protection from gender and/or race-based discrimination.  Defendant failed to provide plaintiff with due process, per manifesting retaliatory animus toward plaintiff Benuto. That is, defendant refused to provide plaintiff Benuto with adequate timely and specific notice of why she was being investigated.  The deliberate refusal to provide plaintiff with such due process intensified the emotional distress plaintiff suffered and magnified the intimidating and deterrent effect, and potential effect, of this investigation, as intended by defendant, or which defendant knew or should have known of, but disregarded in a knowing and/or reckless manner.  The same is true of all other investigations, re plaintiff Benuto, graduate student Thomasson, and/or other plaintiffs, as alleged herein, to sound in retaliatory animus.

98.   This investigation/act of retaliation would likely have had an effect, and was intended by defendant to be attended by such, of intimidating and/or deterring plaintiff from opposing gender and/or race-based forms of discrimination; deterring others from doing the same; and/or deterring potential witnesses from providing testimony in opposition to what they perceived as gender and/or race-based discrimination.  In fact, plaintiff was subject to such an effect, although she successfully resisted such.

99.   As a direct and proximate result plaintiff was injured and harmed as alleged herein.

100.   It has been necessary for plaintiff to incur costs and to retain counsel in order to attempt to vindicate her right to a workplace free of retaliation.

Sixth Cause of Action

(Retaliation - Retaliatory Investigation of Plaintiff)

101.   Plaintiffs hereby incorporate the allegations of paragraphs 1 through 100, inclusive, as well as the allegations of all other paragraphs, as though the same were fully stated herein.  Only plaintiff Benuto is bringing this cause of action.

102.   Defendant deliberately implicated plaintiff Benuto per an investigation of graduate student Madison Thomasson regarding alleged improper appropriation/use of research data - re which plaintiff Benuto was alleged to have been integrally involved and/or in part materially responsible for.  This investigation sounded in retaliatory animus, in material part as a result of plaintiff Benuto's opposition to what she reasonably perceived as various forms of discrimination, as alleged elsewhere herein.

103.   The allegations and/or investigation re graduate student Thomasson and plaintiff Benuto were initiated in approximately February, 2024, per speculation by Professor Weierich - but motivated in actuality, by racial and/or retaliatory animus - that plaintiff colluded with Ms. Thomasson to wrongfully and unethically appropriate research data.  The formal investigation was initiated without providing plaintiff and/or Ms. Thomasson with customary due process and/or professional courtesy, e.g., a initial inquiry which, if made, would have quickly resulted in the very conclusion eventually reached - there was no legitimate basis and/or need for an investigation, i.e., plaintiff Benuto and Ms. Thomasson would have easily and conclusively

Page 54

established the research data was acquired properly and ethically, per the suggestion and under the supervision of plaintiff Benuto.

104.  As a direct and proximate result plaintiff Benuto was injured and harmed as described herein.  Defendant initiated and conducted this investigation per indulging retaliatory animus against plaintiff Benuto and while knowing the investigation was likely to deter plaintiff Benuto from opposing what she reasonably perceived to be discrimination, and for the express purpose of accomplishing that objective.  This investigation would likely have deterred and/or intimidated other potential complainants of discrimination, as well as intimidating and/or deterring potential witnesses likely to provide testimony which would corroborate, in whole or part, plaintiffs' allegations of discrimination.  The act of retaliation did, in fact, intimidate plaintiff Benuto from continuing to oppose what she reasonably perceives to be race-based and or gender-based forms of Title VII related discrimination.

105.  It has been necessary for plaintiff Benuto to incur costs and retain counsel in an attempt to vindicate her federally protected right to be free of retaliation.

<u>Seventh Cause of Action</u>

(Retaliation - Perverting and Weaponizing an Investigation, Required per Plaintiff's Complaint/Refusing to Conduct a Thorough Investigation of Plaintiff's Complaint)

106.  Plaintiffs hereby incorporate the allegations stated in paragraphs 1 through 105, inclusive, and all other paragraphs, as though the same were fully stated herein.  Only plaintiff Benuto is bringing this cause of action.

107.  In April, 2024, plaintiff Benuto lodged a complaint with defendant regarding what she perceived as inequitable and/or discriminatory/retaliatory FMLA procedures, acts and/or practices, which she reasonably perceived had been directed at her.  At the time Dr. Benuto lodged this complaint she was aware, as any person, comparably situated, who had been subjected to similar discrimination, hostility and/or retaliatory animus, that her relationship with UNR was unusual in that it had been recently attended by hostility, excessive scrutiny and distrust, and punctuated by acts of retaliation - and that this state of affairs was likely to continue.  Accordingly, Dr. Benuto reasonably perceived any interview of her, conduct by UNR

would likely be perverted and weaponized against her - so as to be used against her to acquire unfair tactical advantage in litigation which Dr. Benuto anticipated initiating against UNR. These acts of retaliation, as alleged in this cause of action, had the intended effect of intimidating plaintiff Benuto relative to continuing to oppose what she reasonably perceived as race-based and/or gender-based forms of discrimination.

108.   In response to UNR's request to interview her, plaintiff Benuto offered to participate in an interview regarding her FMLA related complaint, but proposed conditions which she reasonably posited, with the intent of preventing her interview from being morphed into a means or mechanism of facilitating retaliation against her.  Dr. Benuto proposed to stipulate so as to agree to forestall from contending, in any prospective litigation, that UNR conducted an incomplete or defective interview, and that UNR, in turn, agree to stipulate to forego from using her interview against her in any prospective litigation between herself and UNR.  That is, Dr. Benuto proposed she and UNR proceed in a manner which would allow UNR to conduct a thorough investigation of her complaint, and if appropriate, then implement proper remedial and preventive action, while preventing both herself and UNR from using her interview in prospective litigation, contemplated by herself and known to be so contemplated by UNR.

109.   Defendant UNR refused to conduct a thorough investigation of plaintiff's complaint, notwithstanding its own policies, and federal and state law, which promised and/or required a thorough investigation, i.e., an investigation which included a proper interview of the complainant - unless plaintiff agreed to allow UNR to attempt to use her interview against her in litigation which both plaintiff and UNR anticipated would shortly be initiated by plaintiff.  UNR thereby manifested an intent to pervert and weaponize the investigation of plaintiff's complaint in a manner likely to deter plaintiff from pursuing her allegations of various forms of discrimination, actionable per Title VII.  At all relevant times herein mentioned, UNR was aware of plaintiff's intent to bring a lawsuit in United States District Court, based on allegations of discrimination, actionable per Title VII.  Plaintiff Benuto clearly perceived UNR's retaliatory intent and was, in fact, intimidated and deterred from pursuing her

complaint, e.g., participating in an interview with UNR so as to provide UNR with detailed information for the purposes of facilitating a proper investigation and then fashioning effective remedial and/or preventive actions.  Other potential complainants, similarly situated would likely have been similarly intimidated and/or deterred, as would have been percipient witnesses capable of corroborating plaintiff's allegations of discrimination, actionable per Title VII, with truthful testimony.

110.  Merely communicating an intent to misuse or pervert an investigation of plaintiff's complaint so as to use a material part of the investigation, i.e., plaintiff's interview, against plaintiff in anticipated Title VII litigation, constituted an act of retaliation because the act of communicating such an illegitimate intent likely would intimidate and/or deter plaintiff and/or other possible complainants, and/or potential witnesses.  And, in fact, plaintiff Benuto was so intimidated and deterred.  Defendant UNR followed through on the communication of its intent to weaponize the interview of plaintiff Benuto by refusing to conduct that interview in response to plaintiff's insistence on a binding assurance, provided by UNR, that her interview would not be weaponized, i.e., used against her in prospective and anticipated Title VII litigation.  The act of communicating an intent to weaponize plaintiff's interview constituted a discrete act of retaliation, as did the deliberate failure to conduct a thorough investigation, i.e. an investigation which was incomplete as a matter of course because the complainant [plaintiff] had not been thoroughly interviewed.

111.  UNR committed these acts of retaliation and as a direct result plaintiff Benuto was injured and harmed as described herein.  The intensity of the ambient and ongoing hostility, actionable per Title VII, which all plaintiffs were experiencing was increased as a direct and proximate result of these acts of retaliation, and knowledge thereof.  Plaintiffs O'Donohue & Fisher quickly learned of defendant's UNR's acts of retaliation.  Plaintiffs, and each of them, reasonably apprehended as a result of the allegations stated in this cause of action that defendant was very determined to retaliate against each of them and would go to extraordinary, and obviously actionable lengths to successfully retaliate.  Plaintiffs, and each of them, reasonably apprehended they did not enjoy the protection of any of the anti-discrimination

policies defendant UNR repeatedly promised them would protect them from various forms of discrimination and/or provide an effective mechanism to remedy discrimination if such occurred.  Furthermore, plaintiffs, and each of them, reasonably apprehended based on defendant UNR's open and obvious acts of retaliation, that they would be likely subject in the near future to additional acts of retaliation and/or manifestations of retaliatory hostility. Plaintiffs' emotional distress, fear and apprehension and feelings of helplessness were intensified by the awareness the persons who had been harassing and discriminating against them for years, e.g., Chair Crognale, were almost certainly cognizant of UNR's decision to retaliate, as alleged in this cause of action, and would thereby almost certainly be embolden to continue to harass and discriminate against them, and to intensify such harassment and/or discrimination.

112.  It has been necessary for plaintiff Benuto to incur costs and retain counsel in order to attempt to vindicate her federally protected right to a workplace free of retaliation, actionable per Title VII.

<u>Eighth Cause of Action</u>

(Retaliation - Unfounded/Retaliatory/Abusive Investigation)

113.  Plaintiffs hereby incorporate the allegations stated in paragraphs 1 through 112, inclusive, as well as the allegations of all other paragraphs, as though they were stated in full herein.  Only plaintiff Lorraine Benuto is bringing this cause of action.

114.  In December, 2024, defendant initiated another retaliatory investigation against plaintiff Benuto based on unfounded allegations plaintiff misused FLMA leave; was dishonest re use of FMLA leave; etc.  This investigation constitutes a discrete act of retaliation, actionable per Title VII.  The abusive manner, alleged below, in which the investigation is being conducted constitutes retaliatory hostility, likewise actionable per Title VII.

115.  The retaliatory character of the FMLA investigation is evidenced by the course of conduct alleged herein and by the abusive manner in which UNR has conducted this investigation to date.  UNR improperly inquired into plaintiff Benuto medical history regarding childbirth.  When UNR's investigator and attorney were asked why such an inquiry was proper,

UNR's counsel responded in an ineffectual and disrespectful manner, i.e., he stated, "we're not in court," or with words to that direct effect.  UNR failed/refused to make and/or articulate an adequate showing of relevance, as required by Federal Rule of Evidence 412 and subsequently has attempted to exploit plaintiff's justified and proper refusal to answer the abusive inquiry as a basis for disciplining plaintiff.  The dichotomy is startling and highly probative of retaliatory animus, gender animus and racial animus, harbored repeatedly manifested by UNR.  Chair Crognale has been free to yell at women employees of UNR, subsequent to bragging about his alleged martial arts abilities, sans investigation.  UNR, in contrast, considers itself at liberty to invade plaintiff Benuto's private medical/sexual history by inquiring into the details of childbirth; refusing to investigate Crognale and/or remedy his conduct; engaging in what appears to be fraud by omission re the American Psychological Association; engaging in what appears to be fraud by omission relative to student applicants to the Program, i.e., failing to inform them of the facts and circumstances Crognale stated in his Response to the 2023 External Review Report; and taking action to shut down the Trauma Program in violation of UNR's contract with the State of Nevada.

116. As a direct and proximate result of being subjected to this act of retaliation, implemented against plaintiff Benuto in response to her opposition to what she reasonably perceived to be race-based and/or gender-based forms of discrimination, plaintiff Benuto suffered emotional distress, interference with her ability to perform work-related duties and was otherwise harmed and/or injured as described herein.  This act of retaliation had the intended effect of intimidating plaintiff Benuto relative to continuing to oppose what she reasonably perceived to be gender-based and/or race-based forms of Title VII related discrimination.  Plaintiff Benuto has been able to continue to attempt to oppose such discrimination only because of the continued support of her family, co-plaintiffs, friends and students - and because of her strong and courageous character.

117.  It has been necessary for plaintiff Benuto to incur costs and retain counsel in order to attempt to vindicate her federally protected right to be free of Title VII related retaliation.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Ninth Cause of Action

(Retaliation - Retaliatory Investigation)

118.  Plaintiffs hereby incorporate all of the allegations stated in paragraphs 1 through 117, inclusive, as well as all allegations in other paragraphs, as though the same were fully stated herein.  Only plaintiff O'Donohue is bringing this ninth cause of action.

119.  In June, 2024, UNR initiated a retaliatory investigation against plaintiff O'Donohue, motivated by animus sounding in plaintiff O'Donohue's opposition to what he reasonably perceived as gender-based and/or race-based harassment directed at other employees, including plaintiff Fisher, and graduate students of the Program.  This was a Chapter VI investigation, which could have resulted in plaintiff O'Donohue's termination of employment.  Defendant UNR refused to provide plaintiff O'Donohue with adequate notice prior to his interview, e.g., defendant UNR failed to inform O'Donohue with reasonable specificity of the allegations re which he was being investigated.  The failure to provide adequate notice was deliberate, and intended to sabotage plaintiff O'Donohue's ability to defend against bogus charges of misconduct, sounding in retaliatory animus.  The failure to provide due process was an act of retaliatory hostility, subsumed within an act of retaliation, i.e., the investigation itself.

120.  This investigation was unfounded and was part and parcel of UNR's deliberate course of retaliatory hostility and retaliation.  Plaintiff O'Donohue, at all relevant times, knew this investigation was unfounded and that the genesis of the investigation was retaliatory animus harbored by decision-makers in the employ of defendant.  This knowledge increased plaintiff's emotional distress and interference with plaintiff's ability to discharge his professional, work-related duties. This investigation materially interfered with plaintiff O'Donohue's ability to discharge his professional duties by, for instance, consuming hours of plaintiff's time; distracting plaintiff with the prospect of discipline, and perhaps, loss of his employment; causing plaintiff to experience emotional distress, and associated symptoms, which interfered with his ability to discharge his duties in a professional and effective manner; and causing plaintiff to suffer as otherwise alleged herein.  This act had the intended effect of

Page 60

intimidating plaintiff O'Donohue regarding continuing to oppose what he perceived to be various forms of race-based and/or gender-based of discrimination.  Plaintiff O'Donohue has been able to continue to attempt to oppose such discrimination only because of the support of friends, family members, students, co-plaintiffs and various colleagues - and he because he is a strong and courageous man.

121.  It has been necessary for plaintiff O'Donohue to incur costs and retain counsel in order to attempt to vindicate his federally protected right to be free of Title VII related retaliation and retaliatory hostility.

Tenth Cause of Action

(Retaliation - Perversion/Weaponization of Investigation of Plaintiff's Title VII Internal Complaint/Retaliatory Failure to Conduct Thorough Investigation, Followed by Failure to Foment and/or Implement Remedial and/or Preventive Action)

122.  Plaintiffs hereby incorporate the allegations of paragraphs 1 through 121, inclusive, as well as those of all other paragraphs, as though the same were fully stated herein. Only plaintiff O'Donohue is bringing this cause of action.

123.  Plaintiff O'Donohue filed a Title VII Charge of Discrimination with the Nevada Equal Rights Commission, against defendant, on or about August 13, 2024.  Plaintiff O'Donohue thereby alleged past and ongoing forms of discrimination, actionable per Title VII which occurred, and were occurring (and likely to continue to occur) per the conduct of defendant's Clinical Psychology Program.  At all times herein mentioned defendant knew, and/or should have known some or all of Dr. O'Donohue's allegations had merit and otherwise required immediate and intensive investigatory efforts and then, probably, remedial and/or preventive action.  Defendant knew this to be so by, for example, having the benefit of receipt of the 2023 External Review Report, Chair Crognale's Response to that Report, numerous prior complaints of Title VII forms of discrimination, actual and/or constructive knowledge of incidents of apparent hostility, potentially actionable per Title VII (e.g., Crognale having yelled at plaintiff Benuto why exhibiting obvious and intense anger in the presence of many witnesses who were employed by UNR, or were students of UNR), etc.  Defendant had a duty, pursuant

to Title VII, and the policies it promised plaintiff O'Donohue the two other plaintiffs, and all other employees, to promptly, thoroughly and fairly investigate the August 13, 2024, complaint made by Dr. O'Donohue for the purpose of being in a knowledgeable position to foment and then implement any remedial and/or preventive measures which might be required per Title VII and/or UNR's policies. A thorough investigation, in this instance, had as a predicate a lengthy and detailed interview of plaintiff O'Donohue. Without that interview any investigation would have been incomplete as a matter of course, e.g., essential facts, some of which were known only to plaintiff O'Donohue would remain undiscovered or only partially disclosed or explained. That a thorough investigation required a lengthy and detailed interview of Dr. O'Donohue was, at all relevant times herein mentioned, known to both Dr. O'Donohue and defendant.

124. Plaintiff O'Donohue had extensive written communication with defendant's General Counsel whereby he offered to be interviewed and to forestall from questioning and/or litigating the thoroughness of his interview relating to his complaint, on the condition defendant forestall from attempting to use his statements made in the interview in prospective litigation between himself and defendant. At the time these communications were made, defendant was cognizant plaintiff O'Donohue was represented by counsel, known to specialize in Title VII litigation, who had previously litigated a number of Title VII cases against UNR, and that plaintiff O'Donohue intended to file a Title VII lawsuit in United States District Court, or likely so intended, pursuant to the August 13, 2024 Charge of Discrimination.

125. Defendant refused to conduct a thorough investigation, e.g., to interview plaintiff O'Donohue, and other witnesses who were represented by counsel, i.e., plaintiffs Benuto and Fisher, unless defendant would be allowed to preserve an ability to use Dr. O'Donohue's interview statements against him in prospective litigation. Defendant thereby communicated an intent to abandon its duty to attempt to ensure a work environment free of Title VII related hostility and/or retaliation and instead communicated to plaintiff O'Donohue, and plaintiffs Fisher and Benuto a malicious intent, i.e., that UNR was determined to ratify discrimination committed by Chair Crognale and others by protecting perpetrators of discrimination, and

facilitating further Title VII related discrimination. Defendant communicated an intent to abandon and violate Title VII , and UNR's policies which purported to complement Title VII, and to allow past discrimination and its effects, to remain without a remedy, and to encourage further discrimination.

126. Defendant's attempted perversion and weaponization the investigation of Dr. O'Donohue's Title VII complaints were attended by the obvious and very likely effect of deterring plaintiff O'Donohue from pursuing resolution of his Title VII related complaints, from making additional Title VII related complaints, of deterring other potential Title VII complainants from complaining of Title VII related discrimination, and/or of deterring potential witnesses from providing testimony and/or evidence for the purpose of opposing Title VII related discrimination, including the Title VII related discrimination which plaintiffs O'Donohue, Benuto & Fisher had complained of. These acts of retaliation had the intended effect of intimidating Dr. O'Donohue relative to continuing to oppose what he perceived as various forms of Title VII related discrimination.

127. Defendant committed discrete acts of retaliation by communicating an intent to pervert and weaponize the investigation of Dr. O'Donohue's Charge of Discrimination and by following through on that expressed intent, i.e., by deliberately conducting an inadequate and incomplete investigation while knowing in advance the investigation would be inadequate and incomplete if Dr. O'Donohue refused to acquiesce to defendant's attempt to pervert and weaponize his interview against him. Plaintiff O'Donohue, and plaintiff Benuto (see above), reasonably apprehended, based on defendant's past conduct and the attempt to use their interviews against them, that defendant would use the interviews of themselves, and their statements therein, to intimidate them, and/or to acquire unfair tactical advantage by misrepresenting their statements, etc. *See, e.g., Doe v. Wynn Resorts, Ltd.*, 2023 U.S. Dist. LEXIS 19257; 2023 WL 1782439 (Dist. N.V. 2023).

128. At all relevant times herein mentioned, all plaintiffs were aware of a myriad of facts and circumstances, as herein alleged, which would have likely caused any reasonable person, likewise cognizant of such facts and circumstances, to apprehend defendant was likely

to attempt to use the interviews of plaintiffs to acquire unwarranted and unfair tactical advantage in prospective/anticipated litigation. Plaintiffs O'Donohue and Benuto acted reasonably and in good faith by fomenting and proffering a method of proceeding which would have facilitated thorough investigations, while forestalling defendant and themselves from attempting to use their interviews so as to acquire tactical advantage in prospective/anticipated litigation. Defendant acted unreasonably, in derogation of Title VII and the promises it made to plaintiffs and others via disseminating its Title VII policies, and in a manner which constituted acts of retaliation, actionable per Title VII.

129. As a direct and proximate result plaintiff O'Donohue was injured and harmed as alleged herein - especially with regard to adverse interference in his ability to conduct his job-related duties. For example, plaintiff O'Donohue reasonably apprehended, as defendant knew he would, that defendant was maintaining steadfast retaliatory hostility toward himself, and per that hostility was willing to (1) openly abandon its Title VII policies; (2) forestall from conducting required investigations into credible allegations of Title VII related discrimination; (3) deceive the American Psychological Associated by commission and omission; (4) deceive student applicants to the Clinical Psychology Program by omission and commission as to, for example, the existence of a collegial atmosphere, conducive to a pleasant and productive learning experience; (5) forestalling from redressing known instances of discrimination; (6) facilitate further Title VII discrimination which was known to very likely occur; (7) maintain the Program in TAG status for the purpose of discriminating against plaintiffs by depriving them of decision-making power and other work related responsibilities, privileges and powers; (8) continue to forestall from providing required and necessary assistance to plaintiffs as the result of long-term retaliatory and/or discriminatory animus; and (9) to continue to engage in various acts of retaliation, e.g., unwarranted and retaliatory audits and/or investigations.

130. It has been necessary for plaintiff O'Donohue to incur costs and retain counsel in order to attempt to vindicate his federally protected right to be free of Title VII related retaliation.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Eleventh Cause of Action

(Retaliation/Deprivation of Job Duties/Responsibilities/Retaliatory Use of FMLA/Retaliatory

Assignment of Job Duties)

131.  Plaintiffs hereby incorporate the allegations of paragraphs 1 through 130, inclusive, as well as those of all other paragraphs, as though the same were fully stated herein. Only plaintiff O'Donohue is bringing this cause of action.

132.  Dr. O'Donohue has been integrally involved in The Victims of Crime Treatment Center since approximately October, 1996.  Part and parcel of Dr. O'Donohues work duties have been administration and oversight of a "Victims of Crime Treatment Program" (hereinafter "Treatment Program").  Per that Treatment Program plaintiffs O'Donohue and Benuto have provided free psychological care to more than one thousand victims, i.e., children, adolescents and adults who endured sexually related trauma.  Most of those victims suffered from Post Traumatic Stress Disorder and were, and are, in dire need of psychological treatment. The care provided by the Treatment Program is free.  More than 140 doctoral students have participated in the Treatment Program, i.e., provided care to victims of sexually related trauma under the supervision of Drs. O'Donohue & Benuto.  A number of years ago plaintiff Dr. Benuto joined the Treatment Program in the capacity of Co-Director.   Plaintiffs O'Donohue and Benuto recruit, train and supervise clinical psychology graduate students, who provide psychological treatment to victims of sexually related trauma.  Plaintiffs Benuto and O'Donohue care deeply about the Treatment Program, the graduate students who participate in the Treatment Program and the clients of the Treatment Program.  Both derive intense personal and professoinal satisfaction and fulfillment as the result of helping hundreds of victims of sexual trauma per the Treatment Program.  Both have enjoyed a deep sense of accomplishment as the result of their work in the Treatment Program. That both plaintiffs care deeply about the Treatment Program, students involved in the Treatment Program, and clients of the Treatment Program is a circumstance which has been known to defendant for years.   That circumstance is common knowledge among most of  defendant's employees who work in the Psychology Department.  Chair Crognale is cognizant of this circumstance and has been so aware for years.

133. The Treatment Program has been, and is, in large part, funded by a grant provided by the State of Nevada, specifically by the State's Division of Child & Family Services. In turn, the Division of Child and Family Services obtained some, or all, of those funds from the United States Government - per the Victims of Crime Act. The Treatment Program is currently funded per a grant, as memorialized in a "Notice of Subaward," which provides funding in the amount of $138,293.00 from July 1, 2024 through June 30, 2025. Approximately 26% of this amount, i.e., about thirty-two thousand dollars was appropriated by defendant, i.e., defendant took possession of that approximate $32,000 and used those monies for its own purposes - external to the Treatment Program. The Notice of Subaward memorializes a binding Agreement, or contract, between the University of Nevada Reno and the Division of Child & Family Services. The terms of the Notice of Subaward have been, at all relevant times herein mentioned, known to defendant, and in particular to Chair Crognale.

134. The Agreement/Notice of Subaward states in material part:

Dr. O'Donohue will be responsible for the following services: 1) overall management of the program; 2) direct clinical services; 3) providing oversight on the clinical case management of all cases; 4) conducting weekly staff meetings; 5) weekly individual clinical meetings for project staff; 6) public relations with other agencies, including outreach; 7) hiring and supervision of all staff; 8) ensuring compliance with all federal and local guidelines; 9) training staff; and 10) analyzing and writing an evaluation report of the proposed program. We are requesting funds to cover his [Dr. O'Donohue] salary in the summer months to cover these tasks. During the 9 academic months, Dr. O'Donohue has 10% of his FTE dedicated to service. Additionally he has 20% of his FTE dedicated to clinical supervision and supervision of graduate students. This totals 30% of his FTE fro 9 months. To meet match a combination of her [sic] service and teaching time will be used to meet match.

Notice of Subaward, p.10 (most pages are not numbered).

135. Dr. O'Donohue's involvement, knowledge and services have been integral and necessary to the success of the Treatment Program. The Treatment Program provides essential and much needed care to members of the northern Nevada community, many or most of whom, would not be able to afford such care if they were compelled to seek such from psychologists in private practice. Almost always, there is a waiting list of northern Nevada residents who wish to obtain the free care provided by the Treatment Program. Closure of the Treatment Program, or significant diminution of services provided by the Treatment Program, will result in

Page 66

irreparable damage to those currently receiving care, prospective clients on the Treatment Program's waiting list, and persons who would, in the future, otherwise avail themselves of care available if the Program continues as is.  Further, graduate students who provide care, obtain valuable experience, and have opportunities to gather information in order to publish peer-reviewed articles, will suffer irreparably per closure of the Treatment Program, or significant diminution thereof - including per the opportunity to be supervised and mentored by Dr. O'Donohue.

136. In November of 2023, the developmentally disabled child of Drs. O'Donohue & Fisher, who has always resided with her parents, began to experience chronic and acute symptoms related to her permanent disability, e.g., delirium, of such intensity and frequency as to require constant care and supervision.  She required multiple hospitalization over a period of months.  Plaintiff Fisher took FMLA leave during the spring semester of 2024 in order to provide care.  Plaintiff O'Donohue took intermittent FMLA leave in the fall semester of 2024 to provide care.  Dr. O'Donohue took intermittent FMLA leave in order to be able to continue to supervise graduate students working in the Treatment Program, and to perform other duties re the Treatment Program, as required by the Agreement with the Division of Child and Family Services.  Dr. O'Donohue's did not attempt to continue to provide services merely because of a wish to comply with a contractual obligation.  Continuity of service to existing clients of the Treatment Program was essential to the well-being of those clients, e.g., to the progress in essential psychological therapy.  Continuity of service is a mandatory ethical requirement per the American Psychological Association's ethics code.

137.  Defendant's Administrator's refused to allow Dr. O'Donohue to continue to supervise graduate students working in the Treatment Program and/or to provide other services to the Treatment Program, despite Dr. O'Donohue's entreaties and protests.  Defendant's decision to prevent Dr. O'Donohue from continuing to provide services to the Treatment Program sounded in retaliatory animus resulting from Dr. O'Donohue's opposition to what he reasonably perceived as forms of gender-based and race-based discrimination, including discrimination directed at his wife, Dr. Fisher.  UNR prevented Dr. O'Donohue from providing

services to the Treatment Program from approximately mid-August, 2024, until present.

138.  Upon information and belief, defendant UNR deceived the Division of Child and Family Services by omission, by failing to inform the Division that Dr. O'Donohue was no longer supervising the "overall management of the program," as required by the Agreement/Notice of Subaward UNR, and the implied duty of good faith and fair dealing which attends such, and which UNR was obligated to follow.  Dr. O'Donohue has attempted to cure UNR's deceit by omission by informing the Division of Child and Family Services of the fact UNR has prevented him from discharging his duties per the Agreement.

139.  On January 2, 2025, Chair Crognale sent Dr. O'Donohue an email and thereby manifested a retaliatory intent to prevent Dr. O'Donohue from providing services to the clients of the Treatment Program and the graduate students who directly provide care, in violation of the Agreement with the Division of Child and Family Services - which requires UNR to facilitate and ensure continued provision of such services by Dr. O'Donohue.  Chair Crognale directly linked this act of retaliation to the FMLA leave which Dr. O'Donohue's wife, Dr. Jane Fisher, resorted to in order to be able to provide essential care for the couple's disabled child while she was in crisis.  Crognale's January 2, 2025 email reads in part:

> As I am sure you are aware, Jane [Fisher] has recently been granted FMLA for the Spring semester.  Since this has again come with little warning, we are in a bit of a bind with how to cover her courses.  Our biggest concern naturally, is her large undergraduate course in Psychology of Aging (Pay335), which currently has 90 students enrolled.   Since we do not have funds to hire an LOA at this late time, we need to utilize existing faculty to cover it.  Unfortunately, we will have to drop Jane's other course in the Spring (currently nine graduate students enrolled).  After examining the course offerings in Clinical, ***it was apparent that replacing your 714 course (the Clinical Practicum "teams" course) with Psyche 335 would be the least detrimental to the curriculum.***  Although this was not an easy decision, it made the most sense, ***<u>given that your absence from this course in the Fall (due to your own FMLA), was made inconsequential by the extra efforts of the four faculty members who managed to supervise all the graduate students.</u>*** . . .

All emphasis added.

140.  Dr. O'Donohue is not qualified to teach the Psychology of Aging course Chair Crognale assigned him.  Dr. O'Donohue lacks the knowledge, education and familiarity with the subject matter, i.e., the psychology of aging so as to be able to competently teach the course, absent an ongoing, intensive effort which will consume many hours and which would

entail Dr. O'Donohue frantically attempting to master the subject on an ad hoc basis throughout the semester.  Dr. Crognale knows this to be true.

141.  By divesting Dr. O'Donohue of the 714 course, Dr. Crognale divested Dr. O'Donohue of meaningful involvement with the Treatment Program, i.e., the graduate students which Dr. O'Donohue would have taught thereby are the students who, per taking the 714 course, would be working in the Treatment Program, and supervised by Dr. O'Donohue.  Chair Crognale acted in a knowing manner, per indulgence of the same retaliatory animus he articulated in his Response to the 2023 External Review Report.  Chair Crognale manifested an intent to deliberately breach the Agreement between UNR and the Division of Child and Family Services.

142.  Chair Crognale deliberately made a false representation, i.e., Crognale is well aware defendant prevented Dr. O'Donohue from providing services to the Treatment Program, i.e., Dr. O'Donohue was not prevented from providing services because he availed himself of FMLA leave, but rather he was so prevented because defendant weaponized that FMLA leave against Dr. O'Donohue and thereby forbid him to provide services to the Treatment Program which he wished to provide.  Dr. O'Donohue took *intermittent* FLMA leave in order to be able to continue to provide services to the Treatment Program and defendant knew this.

143.  Another false representation, strongly probative of Crognale's retaliatory animus, is the assertion Dr. O'Donohue's lack of services during the fall semester was "inconsequential."  In fact, as Crognale knows, Dr. O'Donohue's expertise and experience are very important to the success and effectiveness of the Treatment Program and his absence was harmful - in addition to being contrary to the Agreement with the Division of Child and Family Services.  Crognale's calculated, thinly veiled insult is an act of hostility and, more importantly, is highly probative of retaliatory animus, i.e., that the assignment to the Psy 335 course and the divestiture of Dr. O'Donohue's responsibility re the Psy 714 course constitute two acts of retaliation.

144.  Crognale's willingness to violate defendant's Agreement with the Division of Child and Family Services is highly probative of retaliatory animus.   That is, Crognale's

Page 69

apparent concealment by omission of the lack of involvement of Dr. O'Donohue with the Treatment Program from the Division for approximately the last four months (along with his apparent failure to inform the Division of decisions, as memorialized by Crognale's January 2, 2025 email), are strongly probative of dishonesty and continued retaliatory animus.  Retaining the monies defendant obtained, per involvement of Dr. O'Donohue in the Treatment Program, while failing to inform the Division of Dr. O'Donohue's prior absence, sabotaging Dr. O'Donohue's ability to supervise the Treatment Program while Dr. O'Donohue was on intermittent FMLA leave, and attempting to effect Dr. O'Donohue's permanent absence from the Treatment Program, while failing to inform the Division, is tantamount to fraud by omission.  That is, UNR was, and is under a duty to timely inform the Division of material developments which deviate from the Agreement, e.g., the prolonged absence of the person vested with responsibility for the overall conduct of the Treatment Program.  Crognale appears to have conducted himself with deliberate and casual dishonesty relative to the Division of Child and Family Services, in a manner akin to that which he appears to have behaved relative to the American Psychological Association.  Defendant's toleration, sans investigation or discipline, of Crognale's apparent deceptive and/or fraudulent conduct relative to the APA and the Division constitutes ratification thereof and is also probative of retaliatory animus harbored by those who supervise Chair Crognale, i.e., of defendant, and of the retaliatory character of decisions made by those individuals.  In both instances UNR appears to have benefitted from what appears to be blatant dishonesty by Crognale.  Re the APA, UNR maintained accreditation without incurring timely scrutiny re TAG status and/or the maintenance thereof. Re the Division of Child and Family Services, UNR has retained monies which it received premised on Dr. O'Donohue exercising overall supervision of the Treatment Program from July 1, 2024 through June 30, 2025.  *Both instances of apparent dishonesty/fraud by Crognale facilitated retaliatory hostility and some acts of retaliation, as herein alleged.*  That UNR has, and remains willing to ratify apparent fraud in order to facilitate retaliatory hostility and retaliation directed at Title VII complainants is highly probative of extreme, determined and protracted actionable animus - which necessitates injunctive relief, including appointment of a

Court Master.  Plaintiffs became aware of Crognale's apparent fraud, and UNR's ratification thereof almost contemporaneously and that awareness has markedly intensified the actionable Title VII hostility each has experienced and continues to endure.

145.  The retaliation alleged in this cause of action had the predictable and intended effect of intimidating Dr. O'Donohue.  Such retaliation would have likely intimidated anyone similarly situated to Dr. O'Donohue, i.e., would have likely dissuaded that person from pursing a Title VII related complaint and would likely intimidate any witness who might otherwise corroborate a Title VII related complaint via the provision of testimony or other evidence.

146.  As a direct and proximate result of being subject to retaliation as alleged in this cause of action Dr. O'Donohue's ability to discharge his job-related duties was materially interfered with, and that ability continues to be materially interfered with - to the point at which Dr. O'Donohue is unable to meaningfully participate in the Treatment Program, as required by the Agreement between defendant and the Division of Child and Family Services.  Dr. O'Donohue has also been harmed and damaged as otherwise alleged herein, e.g., has suffered and continues to suffer emotional damages.

147.  It has been necessary for Dr. O'Donohue to incur costs and retain counsel in order to vindicate his federally protected right to be free of Title VII related retaliation.

<u>Twelveth Cause of Action</u>

(Failure to Investigate Title VII Violations)

148.  Plaintiffs hereby incorporate the allegations of paragraphs 1 through 147, inclusive, as well as those of all other paragraphs herein stated, as though the same were fully stated herein.  All plaintiffs are bringing this cause of action.

149.  Defendant deliberately failed to investigate and/or deliberately conducted inadequate investigations of some of plaintiffs' complaints of Title VII violations and/or +incidents of gender-based and/or race-based discrimination known to defendant (e.g., Crognale's 2024 incident which involved yelling at plaintiff Benuto in order to attempt to intimidate her and thereby prevent her from opposing Title VII related discrimination).

150. Defendant UNR failed to investigate, and/or deliberately performed defective

investigations, in order to further its gender-based and/or race-based discriminatory animus and in order to indulge retaliatory animus.

151.  The failures to investigate were likely to deter plaintiffs, who were in fact intimidated, other potential complainants - re Title VII related discrimination, and/or witnesses who might otherwise provide testimony and/or evidence to assist in opposing Title VII related discrimination.  These failures constituted acts of retaliation and/or retaliatory hostility.  *See, e.g., Chesley v. City of Mesquite,* 2023 U.S. Dist. LEXIS 141283; 2023 WL 5206925 (Dist. Nev. 2023).

152.  As a direct and proximate result, plaintiffs were damaged and/or injured as described herein.

153.  It has been necessary for plaintiffs to incur costs and retain counsel in order to attempt to vindicate their federally protect right to be free of retaliation and/or Title VII related retaliatory hostility.

Thirteenth Cause of Action

(FMLA Violations)

154.  Plaintiffs hereby incorporate the allegations of paragraphs 1 through 153, inclusive, as though the same were fully stated herein.  All plaintiffs are bringing this cause of action.

155.  Defendant UNR interfered with plaintiffs' FMLA rights through unfounded and retaliatory investigations, adverse changes to plaintiffs' terms and conditions of employment, e.g., changing class assignments (see, e.g.,  Crognale's January 2, 2025, email to plaintiff O'Donohue) and/or unwarranted and retaliatory disciplinary actions in response to plaintiffs, or the spouse of plaintiff O'Donohue, or conversely the spouse of plaintiff Fisher, availed FMLA benefits, as described herein.

156.  Defendant interfered with plaintiff Benuto's exercise of FMLA rights/benefits by depriving plaintiff Benuto of approximately 23 days of FMLA leave per wrongfully characterizing those days as FMLA leave - despite plaintiff Benuto having actually worked on those days.  Additionally, defendant threatened to increase plaintiff Benuto's workload in

response to her use of FMLA leave.

157.  As a direct and proximate result, plaintiffs suffered intimidation in association with the use of FMLA leave and were otherwise injured and/or harmed as described herein.

158.  It has been necessary for plaintiffs to incur costs and retain counsel in order to attempt to vindicate their federally protected right to unhindered use of FMLA leave.

WHEREFORE, plaintiffs request the following relief:

1.  For awards of compensatory damages;

2.  For an award of costs and a reasonable attorney's fee; and

3.  For such other relief, including injunctive relief, as the Court or jury may deem appropriate, e.g., for an injunction to compel defendant to effectively enforce reasonable policies against sexual and/or racial harassment, and/or discrimination.  Plaintiffs request the appointment of a Court Master, vested with appropriate authority to investigate and remedy past acts of sexual and/or racial discrimination; to deter and prevent sexual and/or racial discrimination, including retaliatory hostility and acts of retaliation; to remedy and attempt to cure extent hostility attendant to past sexual and/or racial discrimination; to enforce whatever injunctive relief this Court may order; and to assist in the removal of the Clinical Psychology Program from TAG status; to prevent impairment and/or closure of the Treatment Program as the result of retaliatory animus; to compel defendant to forestall from further deceit directed a the American Psychological Association (whether by commission or omission); to compel defendant to forestall from further deceit, by commission or omission, directed at Nevada's Division of Child & Family Services; to compel defendant to abide by the terms of the "Notice of Subaward" re the Treatment Program; and to protect members of this community who depend on care provided by the Treatment Program, or who are likely to require future care, etc.

DATED this 7th day of January, 2025.

*/s/ Mark Mausert*
Mark Mausert
NV Bar No. 2398
Sean McDowell, Esq.
Nevada Bar No. 15962
729 Evans Avenue
Reno, NV 89512

TELEPHONE:(775) 786-5477
FACSIMILE: (775) 786-9658
*Attorneys for Plaintiffs*

## INDEX OF EXHIBITS

October 10, 2024 O'Donohue Issued Notice of Right to Sue . . . . . . . . . . . . . . . . . . . . .   Exhibit 1

November 21, 2024 Benuto Issued Notice of Right to Sue . . . . . . . . . . . . . . . . . . . . .   Exhibit 2